No. 26-2626

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

**IN RE JUUL LABS, INC. ANTITRUST LITIGATION**

On Rule 23(f) Interlocutory Appeal from the United States District Court for the Northern District of California, San Francisco Division
No. 3:20-CV-02345-WHO
The Honorable William H. Orrick

# OPENING BRIEF FOR APPELLANTS

Lisa Blatt
Charles L. McCloud
Edward Pickup
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
(202) 434-5000

Jeremy Barber
WILKINSON STEKLOFF LLP
130 W 42nd Street, 24th Floor
New York, NY 10036
(212) 294-8910

Beth A. Wilkinson
James M. Rosenthal
Rakesh Kilaru
Daniel Epps
David Friedman
Jenna P. Swarbrick
Guus Duindam
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
(202) 847-4000

*Counsel for Defendants-Appellants Altria Group, Inc., and Altria Enterprises, LLC*

David I. Gelfand
Jeremy J. Calsyn
Nowell D. Bamberger
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Ave, N.W.
Washington, DC 20037
(202) 974-1752

*Counsel for Defendant-Appellant
Juul Labs, Inc.*

Mark C. Hansen
Michael J. Guzman
David L. Schwarz
Andrew Skaras
Stephanie E. Levin
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street NW, Suite 400
Washington, DC 20036
(202) 326-7900

*Counsel for Defendants-
Appellants Nicholas Pritzker and
Riaz Valani*

## TABLE OF CONTENTS


Table of Authorities .......... ii

Introduction .......... 1

Jurisdiction .......... 5

Questions Presented .......... 5

Statement of the Case .......... 7

Summary of Argument .......... 15

Standard of Review .......... 18

Argument .......... 19

I. This Court Should Reverse Certification of the Indirect Plaintiffs' Multistate Cartwright Act Classes .......... 19

- A. The Cartwright Act Does Not Cover Out-Of-State Sales .......... 20
- B. Choice-of-Law Principles Independently Preclude Applying the Cartwright Act Outside Of California .......... 27
- C. The District Court's Unprecedented Hybrid Approach Cannot Resuscitate Predominance .......... 44
- D. Certification Was Improper Because The Indirect Classes Contain Uninjured Class Members .......... 49

II. Certification of the Direct Purchaser Class Should Be Reversed .......... 50

- A. The Named Plaintiffs' Claims Are Not Typical of the Class .......... 50
- B. The Named Plaintiffs Are Not Adequate .......... 59
- C. The Direct Purchaser Plaintiffs Lack Classwide Proof of Injury .......... 65

Conclusion .......... 72

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alaska v. Suburban Propane Gas Corp.*,
123 F.3d 1317 (9th Cir. 1997) ........ 54, 55

*Alberghetti v. Corbis Corp.*,
263 F.R.D. 571 (C.D. Cal. 2010), aff'd, 476 F. App'x 154 (9th Cir. 2012) ........ 62

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007) ........ 57

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ........ 56, 59, 64

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*,
("AGC"), 459 U.S. 519 (1983) ........ 33

*Avilez v. Pinkerton Gov't Servs., Inc.*,
596 F. App'x 579 (9th Cir. 2015) ........ 63

*Berger v. Compaq Comput. Corp.*,
257 F.3d 475 (5th Cir. 2001) ........ 61

*Blain v. Smithkline Beecham Corp.*,
240 F.R.D. 179 (E.D. Pa. 2007) ........ 45

*Blue Shield of Va. v. McCready*,
457 U.S. 465 (1982) ........ 33

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ........ 65, 69, 70

*Campbell v. Arco Marine, Inc.*,
50 Cal. Rptr. 2d 626 (Cal. Ct. App. 1996) ........ 23, 24

*Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*,
169 So. 3d 164 (Fla. Dist. Ct. App. 2015) ........ 32

*Castano v. Am. Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) .......... 45, 47

*Cepiel v. N.H. Interscholastic Athletic Ass'n*,
2025 WL 1693649 (N.H. June 17, 2025) .......... 35

*Chen v. L.A. Truck Ctrs., LLC*,
444 P.3d 727 (Cal. 2019) .......... 28, 39, 41

*Ciardi v. F. Hoffmann-La Roche, Ltd.*,
762 N.E.2d 303 (Mass. 2002) .......... 32

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021) .......... 33

*Clayworth v. Pfizer, Inc.*,
233 P.3d 1066 (Cal. 2010) .......... 38

*Conde v. Open Door Mktg., LLC*,
223 F. Supp. 3d 949 (N.D. Cal. 2017) .......... 64

*Cont'l Ins. Co. v. Bahan*,
216 F.3d 150 (1st Cir. 2000) .......... 32

*Crouch v. Crompton Corp.*,
2004 WL 2414027 (N.C. Super. Ct. 2004) .......... 35

*CSE Safeguard Insurance Co. v. Hyundai Motor America*,
2024 WL 1832423 (C.D. Cal. 2024) .......... 56

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .......... 4

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) .......... 69

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) .......... 53, 54, 55, 58

*Domingo ex rel. Domingo v. T.K.*,
289 F.3d 600 (9th Cir. 2002) .......... 68

*Foster v. United Airlines, Inc.*,
2023 WL 3102570 n.2 (N.D. Cal. 2023)....46

*FTC v. Qualcomm Inc.*,
969 F.3d 974 (9th Cir. 2020)....31

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)....66

*Gen. Tel. Co. of S.W. v. Falcon*,
457 U.S. 147 (1982)....50, 59

*Gianino v. Alacer Corp.*,
846 F. Supp. 2d 1096 (C.D. Cal. 2012)....44

*Gordon v. Reynolds*,
10 Cal. Rptr. 73 (Cal. Ct. App. 1960)....41

*Grodzitsky v. Am. Honda Motor Co.*,
957 F.3d 979 (9th Cir. 2020)....65

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992)....4, 50, 63

*Hernandez v. Burger*,
162 Cal. Rptr. 564 (Cal. Ct. App. 1980)....16, 41, 42

*Hesse v. Sprint Corp.*,
598 F.3d 581 (9th Cir. 2010)....59

*Ho v. Visa U.S.A. Inc.*,
2004 WL 1118534 (N.Y. Sup. Ct. 2004)....35

*Huch v. Charter Commc'ns, Inc.*,
290 S.W.3d 721 (Mo. 2009)....31

*Humana Inc. v. Bausch Health Cos.*,
2023 WL 4552005 (Cal. Super. Ct. 2023)....38

*Hynix Semiconductor Inc. v. Rambus Inc.*,
2008 WL 73681 (N.D. Cal. Jan. 5, 2008)....70

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .......... 13

*In re Am. Med. Sys., Inc.*,
75 F.3d 1069 (6th Cir. 1996) .......... 49

*In re Auto. Parts Antitrust Litig.*,
2019 WL 626143 (E.D. Mich. 2019) .......... 58

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) .......... 65

*In re Capacitors Antitrust Litigation*,
2020 WL 6462393 (N.D. Cal. 2020) .......... 26

*In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*,
174 F.R.D. 332 (D.N.J. 1997) .......... 48, 49

*In re Google Play Store Antitrust Litig.*,
2023 WL 5532128 (N.D. Cal. 2023) .......... 70, 71

*In re Graphics Processing Units Antitrust Litig.*,
("GPU"), 253 F.R.D. 478 (N.D. Cal. 2008) .......... 57, 60, 64

*In re HIV Antitrust Litigation*,
2022 WL 22609107 (N.D. Cal. 2022) .......... 26

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
383 F. Supp. 3d 187 (S.D.N.Y. 2019) .......... 34, 35, 37, 38

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
2025 WL 3240044 (S.D.N.Y. 2025) (*Keurig II*) .......... 56, 58

*In re Korean Ramen Antitrust Litig.*,
2017 WL 235052 (N.D. Cal. 2017) .......... 26

*In re Milk Prods Antitrust Litig.*,
195 F.3d 430 (8th Cir. 1999) .......... 54, 62

*In re Nat'l Football League Players Concussion Injury Litig.*,
821 F.3d 410 (3d Cir. 2016) .......... 63

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014) ........................................................... 57

*In re Optical Disk Drive Antitrust Litig.*,
2016 WL 467444 (N.D. Cal. 2016) ....................................................... 27

*In re Packaged Seafood Prods. Antitrust Litig.*,
332 F.R.D. 308 (S.D. Cal. 2019) ........................................................... 26

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ......................................................... 18, 65

*In re Tableware Antitrust Litig.*,
241 F.R.D. 644 (N.D. Cal. 2007) ........................................................... 61

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................ 36

*In re Urethane Antitrust Litig.*,
768 F.3d 1245 (10th Cir. 2014) ............................................................ 55

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods.* Liab. Litig.,
895 F.3d 597 (9th Cir. 2018) ................................................................ 59

*J.P. Morgan & Co. v. Superior Ct.*,
6 Cal. Rptr. 3d 214 (Cal. Ct. App. 2003) ................................ 25, 26, 43

*Kanne v. Visa U.S.A., Inc.*,
723 N.W.2d 293 (Neb. 2006) ................................................................ 35

*Kim v. Allison*,
87 F.4th 994 (9th Cir. 2023) ................................................................ 59

*Kirkpatrick v. J.C. Bradford & Co.*,
827 F.2d 718 (11th Cir. 1987) ............................................................... 62

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ................................................................ 35

*Knowles v. Visa U.S.A., Inc.*,
2004 WL 2475284 (Me. Super. Ct. 2004) ............................................. 37

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) .......... 66

*Lab'y Corp. of Am. Holdings v. Davis*,
605 U.S. 327 (2025) .......... 49

*Laumann v. Nat'l Hockey League*,
117 F.Supp.3d 299 (S.D.N.Y. 2015) .......... 68

*Lorix v. Crompton Corp.*,
736 N.W.2d 619 (Minn. 2007) .......... 34

*Madera Grp., LLC v. Mitsui Sumitomo Ins. USA, Inc.*,
2022 WL 1769128 (C.D. Cal. 2022) .......... 46

*Mass. Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharms., Inc.*,
783 F. Supp. 3d 417 (D. Mass. 2025) .......... 32

*Mazza v. American Honda Motor Co.,*

666 F.3d 581 (9th Cir. 2012) .......... *passim*

*McCann v. Foster Wheeler LLC*,
225 P.3d 516 (Cal. 2010) .......... 40, 41

*McGlinchy v. Shell Chemical Co.*,
845 F.2d 802 (9th Cir. 1988) .......... 25

*Minuteman v. Microsoft Corp.*,
795 A.2d 833 (N.H. 2002) .......... 38

*Monroe v. City of Charlottesville*,
579 F.3d 380 (4th Cir. 2009) .......... 61

*Moser v. Benefytt, Inc.*,
8 F.4th 872 (9th Cir. 2021) .......... 5

*N. Alaska Salmon Co. v. Pillsbury*,
162 P. 93 (Cal. 1916) .......... 20, 21

*Nass-Romero v. Visa U.S.A., Inc.*,
279 P.3d 772 (N.M. Ct. App. 2012)........................................................36

*Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co.*,
423 P.3d 605 (Nev. 2018)....................................................................36

*Olean Wholesale Grocery Coop. Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022)................................................1, 18, 19, 50

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014)................................................................50

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022)................................................................32

*R.E. Spriggs Co. v. Adolph Coors Co.*,
112 Cal. Rptr. 585 (Cal. Ct. App. 1974)...............................................25

*Rand v. Monsanto Co.*,
926 F.2d 596 (7th Cir. 1991)................................................................61

*Romero v. Philip Morris, Inc.*,
242 P.3d 280 (N.M. 2010)....................................................................36

*Sitzer v. Nat'l Ass'n of Realtors*,
420 F. Supp. 3d 903 (W.D. Mo. 2019)..................................................31

*Southard v. Visa U.S.A., Inc.*,
734 N.W.2d 192 (Iowa 2007)...............................................................35

*Sprague v. Gen. Motors Corp.*,
133 F.3d 388 (6th Cir. 1998)................................................................50

*Stark v. Visa U.S.A. Inc.*,
2004 WL 1879003 (Mich. Cir. Ct. 2004)...............................................35

*Stromberg v. Qualcomm Inc.*,
14 F.4th 1059 (9th Cir. 2021)........................................................*passim*

*Sullivan v. Oracle Corp.*,
254 P.3d 237 (Cal. 2011).....................................................................23

*Swanson v. Marley-Wylain Co.*,
280 Cal. Rptr. 3d 496 (Cal. Ct. App. 2021) .......................................... 46

*Teague v. Bayer AG*,
671 S.E.2d 550 (N.C. Ct. App. 2009) ................................................... 35

*Valentino v. Carter-Wallace Inc.*,
97 F.3d 1227 (9th Cir. 1996) ........................................................... 48, 49

*W. Waste Serv. Sys., Inc. v. Superior Ct. In & For Maricopa Cnty.*,
584 P.2d 554 (Ariz. 1978) ................................................................... 30

*Walsh v. Ford Motor Co.*,
807 F.2d 1000 (D.C. Cir. 1986) ........................................................... 47

*Ward v. United Airlines, Inc.*,
466 P.3d 309 (Cal. 2020) ............................................................. *passim*

*Wash. Mut. Bank, FA v. Superior Ct.*,
15 P.3d 1071 (Cal. 2001) ..................................................................... 48

*Welling v. Alexy*,
155 F.R.D. 654 (N.D. Cal. 1994) ......................................................... 62

*Wrobel v. Avery Dennison Corp.*,
2006 WL 7130617 (Kan. Dist. Ct. 2006) .............................................. 37

*Zinser v. Accufix Rsch. Inst.*, Inc.,
253 F.3d 1180 (9th Cir. 2001) ..................................................... *passim*

**Statutes**

28 U.S.C. § 1292(e) ............................................................................. 5

Ariz. Rev. Stat. Ann. § 44-1408(B) ........................................................... 30

Cal. Bus. & Prof. Code § 16720(d) ........................................................... 22

Fla. Stat. § 501.211(2) (2025) ................................................................... 29

Haw. Rev. Stat. § 480-13(a)(1) ................................................................ 29

Iowa Code § 553.12(3) (2025) .................................................................. 30

Kan. Stat. Ann. § 50-163(b) .......... 36

Mass. Gen. Laws ch. 93A § 9(3) .......... 30, 31

Mich. Comp. Laws § 445.778(2) (2026) .......... 30

Miss. Code § 75-21-9 (2025) .......... 30

Mo. Rev. Stat. § 407.025(1) (2025) .......... 31

N.D. Cent. Code § 51-08.1-08(3) .......... 30

N.H. Rev. Stat. Ann. § 356:11 (2025) .......... 30, 38

N.M. Stat. Ann. § 57-1-15 (2025) .......... 36

N.Y. Gen. Bus. Law. § 340(6) .......... 38

Neb. Rev. Stat. § 59-821 (2026) .......... 29

Nev. Rev. Stat. § 598A.050 .......... 36

S.D. Codified Laws § 37-1-33 (2026) .......... 38

Utah Code § 76-16-511(1)(b), (2)(a) (2025) .......... 30

**Rules**

Fed. R. Civ. P. 23 .......... passim

**Other Authorities**

Kellen S. Dwyer, *With the* Illinois Brick *Wall Down, What's Left*?,
2 J. Bus. Entrepreneurship & L. 255 (2010) .......... 37, 38

*The Antitrust Logit Model For Predicting Unilateral Competitive Effects*,
70 Antitrust L.J. 257 (2002) .......... 67

## INTRODUCTION

These consolidated antitrust cases concern Altria's former investment in JUUL Labs Inc. (JLI), maker of the JUUL e-cigarette. The Federal Trade Commission (FTC) once challenged that investment, claiming Altria conspired with JLI to withdraw Altria's e-cigarettes from the market prior to the investment. After a trial, an Administrative Law Judge (ALJ) rejected those allegations. Altria later voluntarily unwound its investment, and the FTC dropped its suit. In hopes of a massive payday, Plaintiffs in these copycat suits pressed on.

The district court rewarded those efforts by certifying sweeping, multi-jurisdictional classes of disparate groups of direct and indirect purchasers. In so doing, the court badly distorted class-action law.

*First*, the district court mistakenly found the predominance requirement satisfied for sprawling indirect purchaser classes spanning 27 different jurisdictions across the nation. This Court made clear in *Mazza v. American Honda Motor Co.* that where "the law of multiple jurisdictions applies," such variances can "overwhelm common issues and preclude predominance." 666 F.3d 581, 596 (9th Cir. 2012), *overruled in part on other grounds by Olean Wholesale Grocery Coop. Inc. v. Bumble Bee*

*Foods LLC*, 31 F.4th 651, 682 n.32 (9th Cir. 2022). That is the case here, where the classes span purchases from Maine to Hawaii. Yet the court plowed through this barrier to certification by stacking one reversible error on top of another.

For starters, the court wrongly concluded that all indirect purchasers could sue under California's Cartwright Act. But California law imposes a presumption against extraterritorial application, under which a statute like the Cartwright Act does not apply outside California's borders without affirmative evidence that the legislature intended such application. No such evidence is present here, and the court did not even try to identify any.

Even if the Cartwright Act could apply extraterritorially, it still could not anchor these sweeping classes. The Cartwright Act would not apply under California's own choice-of-law rules—instead, the laws of the States where the JUUL purchases occurred govern those purchases because many of those States' laws differ materially from California and applying California law would harm those States' sovereign interests.

The court partly acknowledged this problem, but its solution only made matters worse. It devised an unprecedented procedure under

which California law will govern *liability* elements of class members' claims while other States' laws will govern *damages* elements—with the details to be sorted out "[a]fter liability is determined." 1-ER-34. That process has no support in any source of law and would result in this case being tried under a Frankenstein-like mishmash of legal frameworks matching no State's actual law. The court's approach also violates this Court's instruction that courts must determine "which law will apply before making a predominance determination . . . when there are variations in applicable state law." *Zinser v. Accufix Rsch. Inst.*, Inc., 253 F.3d 1180, 1189 (9th Cir. 2001).

*Second*, the district court wrongly held that the named plaintiffs for the direct purchaser class were typical of, and adequate to represent, the class. The named plaintiffs are three individuals who bought small quantities of JUUL from JLI online and who, by their own expert's account, each suffered less than $100 in damages. Yet they seek to represent *all* direct purchasers nationwide, including large distributors that spent millions or even billions of dollars on JUUL during the class period and whose purchases make up nearly 93% of direct JUUL sales. Those distinct groups are differently situated and needed their own

representation: unlike online consumers, who bought at prices set by JLI, distributors negotiated individualized contracts and were subject to different pricing policies. And prices paid by the distinct groups did not move in lockstep, as pricing for JUUL pods remained flat for consumers for much of the class period even as it changed for distributors. These differences mean the named plaintiffs did not show their interests "align[] with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Problems with the direct purchaser class do not end there. The class seeks damages looking *backwards* for *past* conduct. But their only proof of common injury is an unprecedented use of a model designed to predict the *future* effects of *prospective* mergers. The model by design ignores what happened in the real world. For example, it assumes that market conditions as of the time of Altria's 2018 investment—such as market shares of JLI and other e-cigarette manufacturers—continued indefinitely thereafter, even though real-world data shows the opposite. Because that analysis is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the direct purchasers lack proof of common injury and cannot establish predominance.

The Court should reverse the class certification decision.

## JURISDICTION

The district court granted class certification on February 26, 2026. Defendants-Appellants timely petitioned for interlocutory review on March 12, 2026, and this Court granted review on April 27, 2026. This Court has jurisdiction under Rule 23(f) and 28 U.S.C. § 1292(e). In reviewing a certification order under Rule 23(f), this Court may consider any issue "which formed part of the class certification decision and affected whether [the] classes could be certified." *Moser v. Benefytt, Inc.*, 8 F.4th 872, 876 (9th Cir. 2021).

## QUESTIONS PRESENTED

1. Whether the district court properly certified two sweeping 27-jurisdiction classes of indirect purchasers under an unprecedented procedure where:

a. California's Cartwright Act applies extraterritorially, notwithstanding the absence of any evidence to overcome California's presumption against extraterritoriality;

b. California law applies to out-of-state purchases, notwithstanding California's choice-of-law rules, which dictate the opposite outcome; and

c. the Cartwright Act would govern the *liability* elements of plaintiffs' claims, but other state laws would govern the *damages* elements of plaintiffs' claims.

2. Whether the district court properly certified a class of direct purchasers where:

a. the named plaintiffs are consumers who purchased small quantities online and are neither typical of, nor adequate to represent, large distributors constituting the overwhelming bulk of the purchases, and

b. plaintiffs' expert calculated a backwards-looking overcharge by misapplying a methodology typically used for predicting the forward-looking effects of mergers.

## STATEMENT OF THE CASE

As the Food and Drug Administration (FDA) has concluded, e-cigarettes are "a lower-risk alternative for adults who smoke cigarettes" because they deliver nicotine without burning tobacco.[1] Altria, which owns the largest U.S. cigarette manufacturer, once had an operating company called Nu Mark that sold innovative non-combustible products such as e-cigarettes. 4-ER-538. Nu Mark's original e-cigarette was a "cig-a-like" (meaning it was shaped like a traditional cigarette) called MarkTen.

In 2015, a startup called JLI introduced JUUL, a new kind of e-cigarette. JUUL was a "pod," meaning it did not resemble a cigarette. *See* 5-ER-683. It was available in nicotine strengths of up to 5%, outstripping other e-cigarettes on the market such as MarkTen. 4-ER-528. Most importantly, JUUL contained "nicotine salts," which enabled it to "more closely mimic the nicotine hit" from traditional cigarettes. 5-ER-844. "[A]ided by its use of nicotine salts," JUUL transformed the market. 4-ER-540 at n.29. While cig-a-like sales cratered, sales of pod-based e-

---

[1] https://www.fda.gov/tobacco-products/health-effects-tobacco-use/relative-risks-tobacco-products#Are%20E-Cigarettes%20a%20Lower

cigarettes increased by over 600%. 3-ER-258. That posed a problem for Nu Mark, which only sold cig-a-likes. 4-ER-538.

Altria tried to launch its own pod, Elite, in February 2018. 4-ER-564. But Elite had numerous problems, including that it lacked nicotine salts and only came in 1.8% nicotine strength. 3-ER-210; 4-ER-541. Under the governing statute and FDA regulations, moreover, Altria could not launch a new pod product (or improve Elite) without first obtaining FDA authorization—an uncertain process that would take years and cost millions. *See* 6-ER-938-942 (ALJ Initial Decision, explaining regulatory framework). When, in September 2018, the FDA sent a letter pressuring Altria to take "prompt action" in response to youth vaping, 3-ER-284-287, Altria pulled Elite from the market, along with all of Nu Mark's non-traditional flavored cig-a-likes, 3-ER-290-294. Not long after, faced with projections that Nu Mark would lose $235 million over the next three years, 3-ER-374, Altria determined Nu Mark had no credible prospects of success and shut it down to free up resources for other efforts, 3-ER-402.

On December 20, 2018, following months of on-again, off-again negotiations, Altria invested $12.8 billion in JLI in return for a 35% share.

2-ER-49. The investment agreement included two provisions (both drafted when Altria still had e-cigarettes on the market) relevant to Altria's ability to develop new e-cigarettes or sell its existing ones. *First*, Altria could not develop new e-cigarettes because it would receive JLI's confidential information from providing JLI with regulatory services as well as from the potential to obtain seats on JLI's board in the future. 4-ER-480, 519-520. JLI worried that, without this provision, Altria "could use [JLI's] inside information to develop . . . e-cigarette products that would hurt the value of JUUL." 4-ER-520-521. But this non-compete always included a carve-out permitting Altria to continue with its existing e-cigarettes while the FTC reviewed the deal. *See, e.g.*, 3-ER-304; 4-ER-480. *Second*, Altria agreed to divest its existing e-cigarette portfolio if required to do so by the FTC. 3-ER-441; 4-ER-519-520.

On April 1, 2020, the FTC filed an administrative complaint challenging the transaction. Days later, private plaintiffs filed the suits ultimately organized into these three class actions. Both the Indirect Reseller Plaintiffs (IRPs) and Indirect Purchaser Plaintiffs (IPPs) sued Altria and JLI under state law—the IPPs on behalf of individuals who purchased indirectly for personal use and the IRPs on behalf of businesses

that purchased indirectly for resale. And the Direct Purchaser Plaintiffs (DPPs) brought federal claims against Altria, JLI, and two JLI officers on behalf of everyone (whether an individual or business) who purchased JUUL directly from JLI. These private actions were ultimately stayed while the FTC proceedings unfolded. 2-ER-70-72.

The FTC alleged that Altria shut down its e-cigarette business pursuant to a secret, unwritten agreement that JLI insisted on as a precondition of the investment. After a trial, the ALJ rejected the FTC's theory as based on "pieces of writings, sometimes snippets—often ambiguous, lacking in context, and unexplained," and ruled in Altria and JLI's favor. 6-ER-990.

The ALJ found "substantial credible evidence" that Altria had shut down its e-cigarette business "independent[ly] . . . based on demonstrated business reasons." 6-ER-1006. Specifically, Altria had been unable to get Elite "off the ground" due to pervasive leaking of the nicotine liquid from the pods, 6-ER-952, customers "not adopting the product" despite aggressive promotions, 6-ER-953, and the lack of nicotine salts essential to providing adequate nicotine satisfaction, 6-ER-959. The ALJ recognized that Nu Mark's cig-a-like products faced many of the same

problems, including an inability "to convert adult smokers without a reformulated e-liquid capable of delivering nicotine satisfaction." 6-ER-961.

As for the FTC's theory that JLI had insisted Altria withdraw its products, the ALJ concluded the evidence showed the opposite: "the negotiation evidence shows that Altria's conduct in withdrawing its products from the market was contrary to the desires, expectations, and understanding of JLI." 6-ER-994. Indeed, "JLI was not consulted, and had no knowledge, in advance of Altria's decisions . . . to withdraw products from the market." 6-ER-993. Rather, JLI "clearly desired and expected that Altria would cooperate with the antitrust review process and that Altria's e-vapor assets would be disposed of in compliance with that process," not withdrawn prior to the investment. 6-ER-994. And contrary to the allegation that JLI had sought to suppress competition from Altria, the "evidence" showed "that JLI regarded [Altria's e-cigarettes] as uncompetitive and 'terrible.'" *Id.*

Nor did the ALJ find harm to competition from the withdrawal of Altria's products. 6-ER-1040. To the contrary, the ALJ found no evidence that Altria would be able seriously to "compete[] in the e-vapor market in

the near future," meaning it would not have posed a competitive threat to JLI in any event. *Id.* For all these reasons, the ALJ dismissed the FTC's complaint in full. 6-ER-1041.

While these proceedings were pending, the e-cigarette market underwent a second transformation. In early 2020, the FDA banned flavored e-cigarettes. 5-ER-692-694. Foreign manufacturers responded by flooding the market with cheap, disposable products in illegal flavors. 5-ER-698–699, 709-710. The FDA was unable to stop these products, and disposables rapidly overtook JUUL as the best-selling e-cigarette. 5-ER-721-722. Other manufacturers had also released pods with salts and nicotine levels comparable to JUUL, further increasing competitive pressure on JLI. 3-ER-678, 694. JLI's market share dropped from nearly 70% in 2018 to 20% by 2024. 4-ER-643. In response to this competition, JLI dropped the price of the JUUL device (the reusable battery in which nicotine pods are inserted) by 75 percent—something it never did in response to Altria's products. 5-ER-735-738, 785.

By September 2022, Altria's $12.8 billion investment had lost 90% of its value. 2-ER-43. In March 2023, Altria exchanged its shares in JLI for certain intellectual property rights. 2-ER-46.

The FTC thereafter dismissed the case "as no longer in the public interest." 2-ER-59. Because that dismissal precluded appellate review of the ALJ's decision, the Commission vacated the decision. 2-ER-61-62. The Commission continued in dictum to "clarify [its] position on certain points of law." 2-ER-62. Although the Commission disagreed with the ALJ on certain legal issues, it agreed with the standard the ALJ applied to determine whether Complaint Counsel had proved a conspiracy. 2-ER-64-65.

Notwithstanding the collapse of the FTC's case and the public failure of Altria and JLI's allegedly conspiratorial partnership, Plaintiffs pressed ahead. The IPPs and IRPs (together, the "Indirect Plaintiffs") each sought certification of "Multistate Cartwright Act classes" that would apply California's antitrust statute to claims across 31 jurisdictions with statutes abrogating the rule of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), limiting federal antitrust damages suits to direct purchasers. Alternatively, they sought certification of separate classes for each individual State where a named plaintiff resides (six States for the IPPs and three for the IRPs).

For their part, the DPPs, represented by three individuals who each purchased small amounts of JUUL for personal use, moved to certify a nationwide class of all direct purchasers. Nearly all the transactions in that class involved distributors and retailers—some larger than JLI itself—who purchased millions or billions of dollars of JUUL for resale under individually negotiated contracts. Yet not one of the DPPs' class representatives knew anything about distribution or retail, and two testified they sought to represent only individual purchasers like themselves. 6-ER-1200-01, 1206-07; 7-ER-1226-1230.

To show a classwide overcharge, the DPPs relied on Dr. Pierre Léger, a health care economist who used an antitrust logit model designed to predict *future* effects of planned mergers to determine the overcharge that allegedly occurred in the *past*—and who ignored *all* available data on how the market actually developed after Altria's investment. Plaintiffs cited no other example of any expert using a logit model in this fashion.

Over Defendants' objections, the district court certified all three classes. As to the Indirect Plaintiffs, the court dismissed Defendants' extraterritoriality argument without addressing California law or

precedent, apparently because Defendants had not identified a case "declin[ing] certification *solely* because of extraterritoriality concerns." 1-ER-29 (emphasis added). Turning to choice-of-law, the court slightly modified the proposed multistate classes to exclude four States that "do not allow class actions for the antitrust claims at issue." 1-ER-35. The court recognized that the laws of the remaining 27 jurisdictions differed substantially from the Cartwright Act on damages but summarily asserted those differences could be resolved at trial "through jury instructions or a special verdict form where the jury is tasked with awarding only damages allowed" under those States' laws. 1-ER-33-34.

Turning to the DPPs, the court held that the individual purchaser representatives could represent the entire proposed class, including the differently situated commercial distributors. 1-ER-9. And while it acknowledged that Dr. Léger's model "may not be standard," it concluded "at this juncture" that his assumptions were not so "untenable or illogical" as to require exclusion. 1-ER-12-13.

## SUMMARY OF ARGUMENT

I. The district court erroneously concluded that California's Cartwright Act can govern the claims of all indirect purchasers within two

sprawling classes covering 27 jurisdictions. This Court has repeatedly held that common issues do not predominate where many individual state laws govern claims in a putative class. Just so here: Because the laws of the place of purchase—not California—govern, plaintiffs cannot establish that common questions predominate. Fed. R. Civ. P. 23(b)(3).

A. California law is clear that its statutes should not apply extraterritorially absent some "affirmative indication" that the legislature intended such application. *Ward v. United Airlines, Inc.*, 466 P.3d 309, 317 (Cal. 2020). That presumption applies with full force to the Cartwright Act, and neither plaintiffs nor the district court have ever pointed to any evidence of legislative intent sufficient to overcome it.

B. Even if the Cartwright Act could apply extraterritorially, it still could not govern all class members' claims. Under California's own choice-of-law test, there is a clear conflict between the Cartwright Act and various other jurisdictions' laws, which differ materially on questions such as damages, duplicative recovery, and standing. California law establishes that "the place of the wrong has the predominant interest" in applying its law "with respect to regulating or affecting conduct within its borders." *Hernandez v. Burger*, 162 Cal. Rptr. 564, 568 (Cal. Ct. App.

1980). That place is where the purchases occurred, which for most class members is *not* California.

C. Recognizing a conflict between California and other jurisdictions' laws with respect to damages, the district court *sua sponte* proposed applying California law to govern liability while contemplating that the jury would resolve damages based on the law of each class member's State—without explaining how that process could be manageable or reconciled with Rule 23(b)'s predominance requirement. That approach finds no support in California law or Rule 23, and it improperly relieved plaintiffs from their "burden of demonstrating a suitable and realistic plan for the trial of the class claims." *Zinser*, 253 F.3d at 1189 (cleaned up).

II. The district court erred by certifying the Direct Purchaser class.

A. The DPPs' only three named plaintiffs are individuals who purchased small quantities of JUUL online. But large distributors who purchased millions or billions worth of JUUL are responsible for the overwhelming bulk of purchases in the class. The named plaintiffs are differently situated from those distributors in many ways. Online purchasers paid fixed prices, whereas distributors negotiated terms individually. Prices between the two groups did not move in lockstep, meaning

different evidence would be required to prove the distinct groups' claims. Accordingly, the named plaintiffs are neither typical of, nor adequate to represent, most class members under Rule 23(a).

B. The DPPs also cannot establish predominance under Rule 23(b) because they cannot prove common injury. Their only evidence of injury is Dr. Léger's analysis, but he relied on a model designed to *predict hypothetical* effects of future mergers to *retrospectively* determine an alleged actual overcharge. As a result, Dr. Léger used a methodology that, by design, ignored real-world data contradicting his model's foundational assumptions. To Defendants' knowledge, no court has ever approved this methodology as a reliable way to estimate an overcharge retroactively. His analysis is unreliable and inadmissible under *Daubert*; without it, the DPPs have no classwide proof of injury and no way to establish predominance. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252–53 (D.C. Cir. 2013).

## STANDARD OF REVIEW

This Court "review[s] the decision to certify a class and any particular underlying Rule 23 determination involving a discretionary determination for an abuse of discretion." *Olean*, 31 F.4th at 663 (cleaned up).

In that analysis, this Court "review[s] the district court's determination of underlying legal questions de novo, and its determination of underlying factual questions for clear error." *Id.* (cleaned up).

## ARGUMENT

### I. This Court Should Reverse Certification of the Indirect Plaintiffs' Multistate Cartwright Act Classes

To certify their classes, the Indirect Plaintiffs had to demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Understanding which law will apply before making a predominance determination is important when there are variations in applicable state law." *Zinser,* 253 F.3d at 1189. Where "the law of multiple jurisdictions applies," such variances can "overwhelm common issues and preclude predominance." *Mazza*, 666 F.3d at 596.

To avoid this predominance problem, the Indirect Plaintiffs argued that California's Cartwright Act governed transactions in every State that has repealed *Illinois Brick* in some respect. 8-ER-1751, 1791-1792. The district court largely agreed and certified two classes applying the Cartwright Act to 27 jurisdictions.

This was wrong twice over. *First*, the Cartwright Act does not apply to transactions outside California because there is no "affirmative indication" that the legislature intended the law to govern extraterritorially. *Ward*, 466 P.3d at 317. *Second*, even if the Act *could* apply outside the State, California's choice-of-law test makes clear that whatever interest California might have in applying its law to out-of-state purchases is far outweighed by the interests of other States in regulating commercial transactions within their own borders.

Because twenty-six other state statutes, and not the Cartwright Act, govern out-of-state plaintiffs' claims, Plaintiffs cannot establish predominance as to their Cartwright Act classes. And deferring choice-of-law conflicts on damages, as the court proposed, is impermissible under Rule 23 and California law.

### A. The Cartwright Act Does Not Cover Out-Of-State Sales

California has long recognized that its statutes "[o]rdinarily . . . have no force beyond its boundaries." *N. Alaska Salmon Co. v. Pillsbury*, 162 P. 93, 94 (Cal. 1916). Under California's presumption against extraterritoriality, its law does not apply "to occurrences outside the state . . . unless such intention is clearly expressed or reasonably to be inferred

from the language of the act or from its purpose, subject matter, or history." *Id.* (cleaned up); *Ward*, 466 P.3d at 317 (courts may not "give extraterritorial effect to legislative enactments absent an affirmative indication that such was the Legislature's intent"). This presumption reflects the commonsense "assumption that a legislature generally legislates with domestic concerns in mind." *Ward*, 466 P.3d at 317.

The Indirect Plaintiff classes depend on extraterritorial application of the Cartwright Act. Plaintiffs would extend the Act to cover a Maine resident's JUUL purchase at a Bangor gas station nearly 3,000 miles from California as well as a Hawaii resident's purchase at a Honolulu convenience store across the Pacific Ocean. Plaintiffs accordingly contended below that "the Cartwright Act can be applied extraterritorially." IPP Reply Br. 14 (capitalization altered); IRP Reply Br. 12 (same).

The district court, in granting certification, apparently agreed that extraterritorial application was required for certification. *See* 1-ER-29. But it provided no reason for concluding the Cartwright Act applies extraterritorially. In rejecting the argument "that extraterritorial application of the Cartwright Act is impermissible," the court noted only that although Defendants had cited cases questioning whether the Cartwright

Act could be applied to out-of-state purchases, they had not cited cases where courts "declined certification *solely* because of extraterritoriality concerns." *Id.* (emphasis added).

Nor did the court identify any affirmative evidence overcoming the presumption against extraterritoriality. Under well-established California law, the court could apply the Cartwright Act extraterritorially only after identifying some "affirmative indication" in the Act's text, purpose, or history that the Legislature intended such application. *Ward*, 466 P.3d at 317. No such indication exists.

Begin with the text. Nothing in the Act or its amendments suggests any extraterritorial intent. Quite the opposite: the California legislature expressly declared, in the statute's title, its purpose "to promote free competition in commerce and all classes of business *in this state*." Cartwright Act, ch. 530, 1907 Cal. Stat. 984 (emphasis added). And wherever the Act addresses geographic scope, it expressly limits application to California. *See* Cal. Bus. & Prof. Code § 16720(d) (2025) (impermissible to fix prices of articles "intended for sale, barter, use or consumption *in this State*" (emphasis added)); *id.* § 16727 ("It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise,

machinery, supplies, commodities *for use within the State*, or to fix a price charged therefor . . . .” (emphasis added)); *id.* § 16760(a)(1) (allowing the Attorney General to bring suit “on behalf of natural persons *residing in the state*” (emphasis added)); *id.* § 16770(a) (“It is the intent of the Legislature to ensure that *the citizens of this state* receive high-quality health care coverage in the most efficient and cost-effective manner possible.”) (emphasis added)).

Courts routinely conclude that statutes with similar language do not apply outside California. For example, the California Supreme Court applied the presumption to the Unfair Competition Law, holding that the mere fact that it sweepingly prohibits “any unlawful, unfair or fraudulent business act or practice,” *id.* § 17200, was insufficient to justify extraterritorial application. *Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011). Similarly, California’s Fair Employment and Housing Act does not apply extraterritorially, even though its text “imposes no residency requirement on either the employer or the person aggrieved and no limitation based on where the conduct occurred.” *Campbell v. Arco Marine, Inc.*, 50 Cal. Rptr. 2d 626, 632 (Cal. Ct. App. 1996). In so holding, the *Campbell* court relied on the legislature’s finding that the Act was “an

exercise of the police power of the state for the protection of the welfare, health, and peace of the people *of this state*," *id.*—language that is nearly identical to the declaration in the Cartwright Act's title.

California's legislature knows how to legislate beyond the State's borders when it wants to. In 1905, just two years before enacting the Cartwright Act, the legislature passed an act expanding "local jurisdiction of public offenses," criminalizing in-state actions "which culminate[] in the commission of a crime, *either within or without this state*." Act of Mar. 21, 1905, ch. 529, § 2, 1905 Cal. Stat. 691, 691-92 (emphasis added). A decade later, the legislature granted the Workmen's Compensation Commission "jurisdiction over [certain] controversies arising out of injuries *without the territorial limits of this state*." Act of May 23, 1917, ch. 586, § 58, 1917 Cal. Stat. 831, 870 (emphasis added). The legislature could have used such language in the Cartwright Act, but it chose not to.

Historical context shows why: Local concerns motivated the Cartwright Act. In the early 1900s, local cartels "operated openly in several key California industries—including lumber, baking, ice production, and electrical power—engaging in price fixing and other harmful concerted action." Joshua P. Davis & Julie A. Pollock, *Updating the Cartwright Act*

*for the Twenty-First Century*, 33 Competition 24, 25 (2023). "[A]s a jurisdictional matter," however, "federal law could not reach purely intrastate cartel activity at the time." John M. Landry & Kirk A. Hornbeck, *One Hundred Years in the Making: The Cartwright Act in Broad Outline*, 17 Competition 7, 8 (2008). The Act was aimed at these local cartels—and they knew it. In the immediate wake of its enactment, "more than 30 combinations in wholesalers and retailers" voluntarily dissolved. *Id.* at 8 & n.6 (cleaned up).

California precedent reinforces the Act's intrastate focus. In addressing whether federal law preempted the Act, the California Court of Appeal emphasized that "[t]he state" passed its own antitrust law "to protect its citizens," so the court "perceive[d] no reason to find preemption" where "application of the state act is solely directed to the intrastate effect of the trade involved." *R.E. Spriggs Co. v. Adolph Coors Co.*, 112 Cal. Rptr. 585, 592, 594 (Cal. Ct. App. 1974); *accord McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 813 n.7 (9th Cir. 1988) (agreeing with *Spriggs* that the Act is limited to "conduct that involves intrastate commerce"). More recently, in *J.P. Morgan & Co. v. Superior Ct.*, 6 Cal. Rptr. 3d 214, 217–18 (Cal. Ct. App. 2003), the same court reversed certification of a

multistate indirect purchaser class much like those here. Although the court ultimately ruled on choice-of-law and due-process grounds, it warned against "constru[ing] a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute." *Id.* at 233.

Nor has any other court found an affirmative reason to apply the Act extraterritorially. The courts in *In re HIV Antitrust Litigation*, 2022 WL 22609107 (N.D. Cal. 2022), and *In re Capacitors Antitrust Litigation*, 2020 WL 6462393 (N.D. Cal. 2020), denied certification to multistate Cartwright Act classes on choice-of-law grounds while noting that plaintiffs had "not identified anything from the text . . . or the legislative history . . . that would support extraterritorial application," *In re HIV*, 2022 WL 22609107, at *9; *accord In re Capacitors*, 2020 WL 6462393, at *7 (plaintiffs failed to provide any "reason that might justify the application of the Cartwright Act outside of California"). And while (prior to *HIV* and *Capacitors*) three district courts had certified multistate Cartwright Act classes, none grappled with the extraterritoriality issue. *See In re Packaged Seafood Prods. Antitrust Litig.*, 332 F.R.D. 308, 345 (S.D. Cal. 2019); *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052 at *22 (N.D.

Cal. 2017); *In re Optical Disk Drive Antitrust Litig.*, 2016 WL 467444 at *12–13 (N.D. Cal. 2016).

Because the Cartwright Act applies only to California transactions, the laws of twenty-six other jurisdictions apply to all other transactions, and Plaintiffs cannot establish predominance.

### B. Choice-of-Law Principles Independently Preclude Applying the Cartwright Act Outside Of California

Even if the requisite "affirmative indication" of extraterritorial intent could somehow be found in the Cartwright Act's text and history, *Ward*, 466 P.3d at 317, the Indirect Plaintiffs still could not establish predominance. California choice-of-law rules separately preclude application of the Act to a multistate class-action covering purchases in jurisdictions with materially different laws.

"When state claims are brought, federal courts apply the choice of law rules of the forum state—here, California." *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1067 (9th Cir. 2021). California uses a governmental-interest test analyzing: (1) "the relevant law of each of the potentially affected jurisdictions with regard to the particular issue in question," (2) "each jurisdiction's interest in the application of its own law under the circumstances of the particular case," and (3) "the nature and strength of

the interest of each jurisdiction in the application of its own law to determine which state's interest would be more impaired" by failure to apply its law. *Chen v. L.A. Truck Ctrs., LLC*, 444 P.3d 727, 730–31 (Cal. 2019) (cleaned up). These factors foreclose uniform application of the Act here.

This Court has been here before. In *Mazza*, this Court vacated a certification order resting on nationwide application of California's consumer-protection statute because the laws of individual States applied to purchases in those States. 666 F.3d at 585, 596. And in *Stromberg*, the Court rejected an attempt by indirect purchasers to apply the Cartwright Act nationwide because the States that had declined to repeal *Illinois Brick* held the predominant interest in applying their own laws. 14 F.4th at 1074. Both decisions emphasized that "each foreign state has an interest in applying its law to transactions within its borders[,] and that foreign states would be impaired in their ability to calibrate liability to foster commerce if California law were applied to the entire class." *Stromberg*, 14 F.4th at 1070; *see also Mazza*, 666 F.3d at 591–93. In both cases the need to apply individual state laws meant that "common issues of law" no longer predominated, making class certification improper. *Stromberg*, 14 F.4th at 1067; *see also Mazza*, 666 F.3d at 596;

The same result follows here.

### 1. State Laws Materially Differ

This Court has already determined that, even among *Illinois Brick*-repealer jurisdictions, laws "are hardly uniform" and have "significant variations in . . . scope." *Stromberg*, 14 F.4th at 1068, 1074. "For instance, state repealer laws vary as to the type of law the repeal applies to; who can sue for damages; and the amount or type of damages indirect purchasers can recover." *Id.* at 1068–69. That is why this Court recognized it is "not clear" one could certify a class of repealer States. *Id.* at 1074. Indeed, material statutory differences preclude certification.

*First*, as both this Court and the district court have recognized, repealer States vary "significant[ly]. . . in the amount or type of damages indirect purchasers can recover." *Id.* at 1068–69; *see also* 1-ER-33-34. The Cartwright Act automatically provides treble damages, but other States in the class limit recoveries to actual damages or impose additional evidentiary hurdles to awarding multiple damages. Florida, Hawaii, and Nebraska do not allow multiple damages in suits like this. *See* Fla. Stat. § 501.211(2) (2025); Haw. Rev. Stat. § 480-13(a)(1) (2025); Neb. Rev. Stat. § 59-821 (2026). Mississippi provides for a $500 penalty above

actual damages but otherwise does not allow multiple damages. *See* Miss. Code § 75-21-9 (2025).

Other States permit multiple damages subject to varying types of heightened evidentiary standards. Massachusetts permits a jury to award between double and treble damages, but only for "willful or knowing" violations. Mass. Gen. Laws ch. 93A § 9(3) (2026). New Hampshire and Iowa similarly allow double damages (Iowa) or awards between double and treble damages (New Hampshire), but they require the plaintiff to show "willful or flagrant" violations. N.H. Rev. Stat. Ann. § 356:11 (2025); Iowa Code § 553.12(3) (2025). Utah permits treble damages only if they would not bankrupt the defendant. Utah Code § 76-16-511(1)(b), (2)(a) (2025). Finally, Arizona, Michigan, and North Dakota allow treble damages only for "flagrant" violations. Ariz. Rev. Stat. Ann. § 44-1408(B) (2025); *W. Waste Serv. Sys., Inc. v. Superior Ct. In & For Maricopa Cnty.*, 584 P.2d 554, 556 (Ariz. 1978) (conduct must be "shocking, outrageous, or outstandingly bad"); Mich. Comp. Laws § 445.778(2) (2026); N.D. Cent. Code § 51-08.1-08(3) (2025).

*Second,* three States in the class—Missouri, Massachusetts, and Florida—have not repealed *Illinois Brick* for their antitrust statutes,

meaning their laws directly conflict with the Cartwright Act. Plaintiffs sweep in these States because they have not *extended Illinois Brick* to consumer protection suits by indirect purchasers. But consumer protection statutes differ significantly from antitrust laws, as this Court recognized in *Stromberg*. 14 F.4th at 1068 & n.2 (noting that repealer laws "vary as to the type of law the repeal applies to" because some state repealer statutes apply only to consumer protection statutes). Whereas the latter "were enacted for the protection of competition," *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020) (cleaned up), the former have as their "fundamental purpose . . . the protection of consumers," *Huch v. Charter Commc'ns, Inc.*, 290 S.W.3d 721, 724 (Mo. 2009) (cleaned up).

That distinction is material. Two of the States—Missouri and Massachusetts—do not permit lawsuits by indirect retailer purchasers, meaning none of the IRPs could have filed suit in those States. Missouri requires that the plaintiff purchased "*primarily for personal, family, or household purposes*." Mo. Rev. Stat. § 407.025(1) (2025) (emphasis added); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 916 (W.D. Mo. 2019). Massachusetts is similar. Consumer indirect purchasers may challenge unfair business practices under Section 9 of Massachusetts

General Laws chapter 93A. *See Ciardi v. F. Hoffmann-La Roche, Ltd.*, 762 N.E.2d 303, 311–12 (Mass. 2002). But persons "who engage[] in the conduct of any trade or commerce"—such as resellers—must proceed not under Section 9, but under Section 11, which incorporates Massachusetts's Antitrust Act. *See id.* at 311–12; *Cont'l Ins. Co. v. Bahan*, 216 F.3d 150, 156 (1st Cir. 2000). And under that Act, "*Illinois Brick* [applies] with equal force to preclude" indirect-purchaser claims. *Ciardi*, 762 N.E.2d at 308, 307–08; *accord Mass. Laborers' Health & Welfare Fund v. Boehringer Ingelheim Pharms., Inc.*, 783 F. Supp. 3d 417, 448 (D. Mass. 2025).

In Florida a plaintiff "*does not have to be a consumer* to bring" a consumer-protection suit—but a reseller can sue only if it can "prove that *there was an injury or detriment to consumers*." *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cnty., Inc.*, 169 So. 3d 164, 169 (Fla. Dist. Ct. App. 2015) (emphases in original). By contrast, under the Cartwright Act, retailers can sue without showing consumer harm. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 833 (9th Cir. 2022). Florida law thus adds an element that the Cartwright Act lacks.

*Third*, States that have repealed *Illinois Brick*'s *per se* ban on indirect-purchaser damages suits have retained other limits on such actions to manage the dual risks of speculative and duplicative recovery—by limiting indirect purchaser standing, by authorizing courts to limit duplicative recovery, or both.

Start with standing. The question of "which persons have sustained injuries *too remote* from an antitrust violation to give them standing to sue for damages" is "analytically distinct from" *Illinois Brick*. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 476 (1982) (emphasis in original) (cleaned up). In *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983), the Supreme Court adopted a multi-factor test for antitrust standing, analyzing: "(1) [whether] plaintiff's alleged injury [. . . ] was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages." *City of Oakland v. Oakland Raiders*, 20 F.4th 441, 455 (9th Cir. 2021).

*AGC*'s applicability is material, because the Indirect Plaintiffs likely lack *AGC* standing. Their injury is evidently indirect, and—with

Direct Purchasers pressing claims related to the same injuries—there is a risk of duplicative recovery if Plaintiffs prevail. For the same reasons, "there are alternative enforcers that are better situated to bring suit, and have brought suit." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 223 (S.D.N.Y. 2019).

The alleged harms are also highly speculative. For example, even if the IRPs could prove an overcharge, that does not necessarily mean they could prove injury. According to the DPP's expert, "[e]conomic theory predicts . . . that pass-through rates in highly competitive markets, like e-cigarette distribution and retail, will be close to 100%." 4-ER-625. Indeed, one IRP plaintiff admitted he "always" fully passed on price increases to his customers. 7-ER-1346. Moreover, the Indirect Plaintiffs cannot "preclude the possibility that independent factors, such as costs for transportation, handling, storage, or any other service—rather than overcharges passed down from [JLI]—could have led to the . . . purported damages." *Keurig*, 383 F. Supp. 3d at 224.

States vary in the extent to which they apply *AGC*, resulting in a complicated patchwork. Minnesota has rejected *AGC* because it would limit indirect purchasers' ability to sue. *See Lorix v. Crompton Corp.*, 736

N.W.2d 619, 628 (Minn. 2007). And although California courts have not yet expressly ruled on *AGC*'s applicability, federal courts have recognized that California "affords standing more liberally than does federal law." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).

By contrast, other States retain *AGC* or use a modified version, resulting in stricter limits on suits threatening speculative or duplicative recoveries. Iowa and Nebraska have adopted *AGC* by high court decision. *Southard v. Visa U.S.A., Inc.*, 734 N.W.2d 192, 198 (Iowa 2007); *Kanne v. Visa U.S.A., Inc.*, 723 N.W.2d 293, 297–300 (Neb. 2006). Courts in Michigan, New York, South Dakota, and New Hampshire have similarly dismissed suits under *AGC*.[2] Kansas, Nevada, and New Mexico have

[2] *Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003, at *2–3 (Mich. Cir. Ct. 2004) (applying *AGC*); *Cepiel v. N.H. Interscholastic Athletic Ass'n*, 2025 WL 1693649, at *4 (N.H. June 17, 2025) (same); *Ho v. Visa U.S.A. Inc.*, 2004 WL 1118534, at *2–3 (N.Y. Sup. Ct. 2004) (same); *Cornelison v. Visa U.S.A., Inc.* No. 03-1350 (S.D. Cir. Ct. Sept. 28, 2004) (Tr. of Mot. Hr'g 54:13-54:17, dismissing suit based on threat of "duplicate recovery"); *Keurig*, 383 F. Supp. at 261 (discussing *Cornelison*). North Carolina law appears unsettled on the issue. *Compare Crouch v. Crompton Corp.*, 2004 WL 2414027 at *18–19 (N.C. Super. Ct. 2004) (dismissing complaint under *AGC* and noting that "[d]ouble recovery is not favored") *with Teague v. Bayer AG*, 671 S.E.2d 550, 557–58 (N.C. Ct. App. 2009) (reversing dismissal under *AGC*).

statutes requiring courts to construe state antitrust law "in harmony with prevailing judicial interpretations of the federal antitrust statutes." Nev. Rev. Stat. § 598A.050 (2025); *see also* N.M. Stat. Ann. § 57-1-15 (2025); Kan. Stat. Ann. § 50-163(b). New Mexico courts thus apply *AGC* in unmodified form. *See Nass-Romero v. Visa U.S.A., Inc.*, 279 P.3d 772, 780 (N.M. Ct. App. 2012) (applying *AGC*); *Romero v. Philip Morris, Inc.*, 242 P.3d 280, 291 (N.M. 2010) (New Mexico courts have a "duty" to ensure that state antitrust law "does not deviate substantially from federal interpretations of antitrust law").[3] The Nevada Supreme Court has applied *AGC* to consumer protection claims, even though *Illinois Brick* does not apply to consumer protection statutes. *See Nev. Recycling & Salvage, Ltd. v. Reno Disposal Co.*, 423 P.3d 605 (Nev. 2018).

Meanwhile, a Maine trial court has suggested following a modified *AGC* test—one that discounts "directness" but requires courts to consider "the danger of duplicative recovery and the complex apportionment that may be necessary to avoid such recovery" in the standing inquiry.

[3] Prior to these state court decisions applying *AGC*, a California federal court declined to hold that New Mexico would apply *AGC* because, at that time, "no state in New Mexico . . . ha[d] reached the question." *In re TFT-LCD (Flat Panel) Antitrust Litig.* 586 F. Supp. 2d 1109, 1120-24 (N.D. Cal. 2008) (citation omitted).

*Knowles v. Visa U.S.A., Inc.*, 2004 WL 2475284, at *8 (Me. Super. Ct. 2004).[4]

"There is little dispute" that speculative claims of damages can warrant dismissal under any version of *AGC*. Kellen S. Dwyer, *With the* Illinois Brick *Wall Down, What's Left*?, 2 J. Bus. Entrepreneurship & L. 255, 277 (2010). Consider *Keurig*, 383 F. Supp. 3d 187. There, indirect coffee purchasers claimed Keurig overcharged distributors, who then passed on that overcharge. *Id.* at 216. Applying *AGC*, the court dismissed their claims, explaining that indirect purchasers lack antitrust standing where "the claimed damages are too indirect and may have been produced by factors independent from any alleged overcharge," such as "transportation, handling, storage," or other services. *Id.* at 223–24 (citation omitted). After a comprehensive review, the court concluded that "the antitrust laws of Michigan, New Mexico, New York, South Dakota, New Hampshire, and Nevada" would apply *AGC* to prevent duplicative

[4] Notwithstanding Kansas's harmonization statute, *see supra* 35–36, one Kansas court has adopted a similar modification of *AGC*. *See Wrobel v. Avery Dennison Corp.*, 2006 WL 7130617 at *3–4 (Kan. Dist. Ct. 2006).

and speculative recoveries, meaning "the IPPs lack[ed] antitrust standing" for those States. *Id.* at 264.[5]

Beyond *AGC*, States have adopted additional solutions to prevent duplicative recovery. In California, "damages must be allocated among the various levels of injured purchasers," and "defendants may assert a pass-on defense as needed to avoid duplication." *Clayworth v. Pfizer, Inc.*, 233 P.3d 1066, 1086 (Cal. 2010); *Humana Inc. v. Bausch Health Cos.*, 2023 WL 4552005 at *6, *10 (Cal. Super. Ct. 2023) (any verdict won by indirect purchasers to be discounted by settlement amount paid to direct purchasers). New York and South Dakota go further, allowing courts to "take *any steps necessary* to avoid duplicative recovery." S.D. Codified Laws § 37-1-33 (2026) (emphasis added); N.Y. Gen. Bus. Law. § 340(6) (similar). In those States, it is sometimes "'necessary' for a court to dismiss [an indirect purchaser] claim in order to avoid duplicative liability." Dwyer, *supra*, at 278.

In sum, standing under the Cartwright Act is easier to obtain than under federal law, and the laws of States in the class fall on a spectrum.

[5] The New Hampshire decision on which the *Keurig* court relied—*Minuteman v. Microsoft Corp.*, 795 A.2d 833 (N.H. 2002)—has been superseded by N.H. Rev. Stat §356:11 (2025).

Some States, like New Mexico, apply *AGC* in full; others apply a variant; and others still (like New York or South Dakota) have adopted non-standing rules to limit speculative or duplicative recoveries.

### 2. The Other States Have A Strong Interest In Applying Domestic Law To Transactions Within Their Borders

So long as at least "some of the above differences are material," the Court "move[s] on to the test's second step," *Mazza*, 666 F.3d at 591—whether States besides California have an interest in applying their laws, *Chen*, 444 P.3d at 730–31. Under this Court's precedent, those States do. "It is a principle of federalism that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders." *Mazza*, 666 F.3d at 591 (citation omitted). Each State has an "interest in promoting commerce" within the State, *Stromberg*, 14 F.4th at 1073, and each must be free to choose "the proper balance and boundaries between maintaining consumer protection . . . and encouraging an attractive business climate," *Mazza*, 666 F.3d at 592; *see also* No. 26-1519, Dkt. 13.2, p. 9 (States' Amicus Brief) ("States should be allowed to define the scope of antitrust liability within their own

borders"). Applying California law across the nation robs States of their sovereign right to make those judgments.

California itself recognizes other States' interest in applying their own law to in-state commercial transactions. "[A] jurisdiction ordinarily has 'the predominant interest' in regulating conduct that occurs within its borders." *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010). States must be able "to assure individuals and commercial entities operating within [their] territor[ies] that applicable limitations on liability set forth in the jurisdiction's law will be available to those individuals and businesses in the event they are faced with litigation in the future." *Id.* (collecting cases). States cannot reap the benefits of laws barring duplicative or speculative recovery or forbidding multiple damages unless they can "assure individuals and commercial entities" that those "limitations" will protect them. *Id.* *Mazza* accordingly held "that each foreign state has an interest in applying its law to transactions within its borders and that, if California law were applied to the entire class, foreign states would be impaired in their ability to calibrate liability to foster commerce." 666 F.3d at 593.

### 3. Other States' Interests Would Be Most Impaired By Applying California Law

The Court must finally determine whether an adverse choice of law would most impair California's interest or the interests of the other States. *Chen*, 444 P.3d at 731. In California, "the place of the wrong has the predominant interest" in applying its law "with respect to regulating or affecting conduct within its borders." *Hernandez*, 162 Cal. Rptr. at 568. "[T]he place of wrong is in the state where the last event necessary to make an actor liable . . . takes place." *Gordon v. Reynolds*, 10 Cal. Rptr. 73, 77 (Cal. Ct. App. 1960); *see also McCann*, 225 P.3d at 531 n.12.

*Mazza* and *Stromberg* leave no doubt about how these principles apply here. In *Mazza*, where Honda consumers asserted false advertising misled them into purchasing faulty vehicles, the law of the State "where the last event necessary to make the actor liable occurred" applied. 666 F.3d at 593 (citing *McCann*, 225 P.3d at 531 n.12). Because "the last events necessary for liability as to the foreign class members" were "communication of the advertisements to the claimants and their reliance thereon in purchasing vehicles," *id.* at 594, the laws of the States of purchase governed.

*Stromberg* then applied these principles to the Cartwright Act. Plaintiffs asserting that Qualcomm charged supracompetitive prices for cellphone modem chips proposed a nationwide class of indirect purchasers under the Cartwright Act. 14 F.4th at 1065. This Court first compared "the relevant state interests considering antitrust principles," explaining that each State has its own interest in making "determinations of how to 'facilitate more effective enforcement of antitrust laws.'" *Id.* at 1072. Next, the Court emphasized that the district court should have "evaluate[d] state interests as the 'place of the wrong,'" which is "the state where the last event necessary to make the actor liable occurred." *Id.* at 1073. Because the *Stromberg* class consisted of "individuals who bought cellphones from various retailers located throughout the fifty states," the "last events giving rise to liability would be the consumer's purchase of the cellphone, and thus the 'place of wrong' would be the state where the consumer bought the cellphone." *Id.*

The same result follows here. Plaintiffs are indirect purchasers allegedly subject to an unlawful overcharge. Their place of purchase is the place of the wrong. And the place of the wrong "has the predominant interest" in application of its law, *Hernandez*, 162 Cal. Rptr. at 568,

because it must be able to regulate intrastate commerce under its own antitrust laws. The State where each transaction took place thus has a greater interest in application of its law than does California.

That JLI was headquartered in California at the time of the investment makes no difference, nor do allegations of a single meeting between JLI and Altria in California while negotiating the investment. In *Stromberg*, "Qualcomm's principal place of business [was] in California . . . and Qualcomm made business decisions and negotiated licenses related to its allegedly anticompetitive conduct in California," but other States still had the greater interest. 14 F.4th at 1068. Similarly, in *Mazza*, other States' interest outweighed California's even though both Honda and "the advertising agency that produced the allegedly fraudulent misrepresentations" were California-based. 666 F.3d at 590. And *J.P. Morgan* reversed certification of a multistate Cartwright Act class, emphasizing that the "main focus" in choice-of-law analysis "should be on whether plaintiff's proposed class members made an adequate showing of *their own* significant contacts with California, so that their claims predominantly arose here, and gave rise to a significant interest on the part of California in applying its laws to these classwide claims." 6 Cal. Rptr. 3d

214, 233–34 (emphasis added). The throughline is that States "have a compelling interest in protecting their consumers from in-state injuries caused by a California corporation doing business within their borders and in delineating the scope of recovery for consumers under their own laws." *Gianino v. Alacer Corp.*, 846 F. Supp. 2d 1096, 1103 (C.D. Cal. 2012).

### C. The District Court's Unprecedented Hybrid Approach Cannot Resuscitate Predominance

The district court dismissed out of hand the differences between consumer protection and antitrust statutes and States' divergent approaches to duplicative recovery and standing. 1-ER-29-33. Even so, it conceded "there might be true conflicts in terms of permissible recovery." 1-ER-34. Rather than analyzing those conflicts under California's choice-of-law framework, it devised an unorthodox and unprecedented solution: contemplating that it could apply differing state *damages* laws to Plaintiffs within the same 27-jurisdiction class, while applying the Cartwright Act's *liability* provisions to all class members' claims. *Id*. That solution still ignores all other differences between the relevant state laws. But it cannot solve Plaintiffs' predominance problem in any event.

Courts must analyze "which law will apply *before* making a predominance determination"—especially when "there are variations in applicable state law." *Zinser*, 253 F.3d at 1189 (emphasis added); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 741–42 (5th Cir. 1996) (collecting cases). The district court did not do that, choosing instead to avoid the issue by concluding that multiple different sources of law could apply to individual elements of individual claims within a class. Although the court adopted that approach *sua sponte*, it offered no legal grounding for it. Indeed, no circuit appears ever to have approved this hybrid state-law technique. *Cf. Blain v. Smithkline Beecham Corp.*, 240 F.R.D. 179, 194 (E.D. Pa. 2007) (rejecting plaintiffs' request to apply "different states' laws" to parts of claims in a "multi-state class action").

Plaintiffs have been unable to identify even one example of any other court applying different state laws to distinct elements of different plaintiffs' claims within the same class. Instead, they argued for the first time in response to Defendants' 23(f) petition that "the doctrine of dépeçage" justifies that unorthodox approach. No. 26-1519, Dkt. 20, p. 20. But the district court never mentioned dépeçage, presumably because it cannot justify the court's planned course.

California limits dépeçage, which allows courts to "decide choice of law on an issue-by-issue basis," *Foster v. United Airlines, Inc.*, 2023 WL 3102570, at *2 n.2 (N.D. Cal. 2023), to circumstances not present here. To the extent California applies the doctrine, it is typically employed to permit different state laws to govern different *claims* in the same suit. *See, e.g.*, *Madera Grp., LLC v. Mitsui Sumitomo Ins. USA, Inc.*, 2022 WL 1769128, at *6 (C.D. Cal. 2022) (declining to apply dépeçage to issue that could not be "pleaded as a standalone cause of action"). The California Court of Appeal has expressly *rejected* the possibility that "the law of different states may govern *different elements of a single cause of action*," finding "no authority that would support" extending dépeçage to this "untenable end." *Swanson v. Marley-Wylain Co.*, 280 Cal. Rptr. 3d 496, 503 (Cal. Ct. App. 2021) (emphasis in original). That makes sense: using dépeçage in that way would produce a hybrid cause of action that does not reflect the law of any one State.

The proposal here is even more extreme than what *Swanson* rejected, as the court hopes to apply different laws to the same element of the claim for different members of the same class. Plaintiffs would thus present claims governed by a hybrid of California and Hawaii law

simultaneously with claims governed by a hybrid of California and Michigan law, and so forth. That combines, in an apparently unprecedented way, *two* highly disfavored approaches: applying dépeçage to split up the elements of a claim (as prohibited by *Swanson*) and applying different rules to the very same claims within a single class action, *Zinser*, 253 F.3d at 1189 (applying law of multiple States creates predominance problem).

This hybrid approach presents practical problems as well. Plaintiffs "bear[] the burden of demonstrating 'a suitable and realistic plan for trial of the class claims.'" *Zinser*, 253 F.3d at 1189. Courts "cannot rely merely on assurances of counsel that any problems with predominance or superiority can be overcome." *Id.* (quoting *Castano*, 84 F.3d at 742). Rather, "nationwide class action movants must creditably demonstrate, through an extensive analysis of state law variances, that class certification does not present insuperable obstacles." *Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1017 (D.C. Cir. 1986) (R.B. Ginsburg, J.) (quotation marks omitted). That burden may require the plaintiffs to prove that "such variations can be effectively managed through creation of a small number of subclasses grouping the states that have similar legal doctrines." *Id.* Or

the plaintiffs may need to submit "sample jury instructions or verdict forms necessary to demonstrate a trial blueprint." *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 350 (D.N.J. 1997). As the California Supreme Court has explained, "the court cannot accept 'on faith' an assertion that variations in state laws relevant to the case do not exist or are insignificant." *Wash. Mut. Bank, FA v. Superior Ct.*, 15 P.3d 1071, 1084 (Cal. 2001) (collecting state and federal cases).

As a result, where different laws govern different class members (let alone the myriad additional complexities created by the court's approach), plaintiffs must show "how the class trial could be conducted." *Valentino v. Carter-Wallace Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Yet Plaintiffs did none of this.

Nor did the court explain how its proposal would work, impermissibly deferring that question until "[a]fter liability is determined." 1-ER-34; *see Zinser*, 253 F.3d at 1189. The court's plan is impracticable. Applying distinct damages rules for each State would require the jury to struggle through countless state-specific instructions to determine whether any alleged violation met the relevant standard for multiple damages and, where the amount of multiplication may vary, what level

of multiplication (if any) would be appropriate. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996) ("If more than a few of the laws of the fifty states [in a nationwide class] differ, the district judge would face an impossible task of instructing a jury on the relevant law . . . ."); *Valentino*, 97 F.3d at 1233 (approving of *Am. Med.*). This case is already complex; state-by-state instructions and verdict form questions for 27 different jurisdictions would potentially "overwhelm[] jurors with hundreds of interrogatories and a verdict form as large as an almanac." *Ford Motor*, 174 F.R.D. at 350 (rejecting similar request for certification based on "mere promises [of] a manageable litigation plan").

### D. Certification Was Improper Because The Indirect Classes Contain Uninjured Class Members

Additionally, Plaintiffs cannot establish predominance because many class members suffered no injury. Retailers who passed on the entire alleged overcharge are uninjured, as are consumers who purchased from retailers that fully absorbed any overcharge. *See* 7-ER-1247-1251 (compiling evidence that such class members exist). And "if there are members of a class that aren't even injured, they can't share the same injury with other class members." *Lab'y Corp. of Am. Holdings v. Davis*, 605 U.S. 327, 332 (2025) (Kavanaugh, J., dissenting). Defendants

acknowledge the contrary holding in *Olean*, 31 F.4th at 669, but respectfully preserve this issue for further review.

## II. Certification of the Direct Purchaser Class Should Be Reversed

### A. The Named Plaintiffs' Claims Are Not Typical of the Class

Before certification, a district court must "evaluate carefully the legitimacy of the named plaintiff's plea that he is a proper class representative under Rule 23(a)." *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160 (1982). A named plaintiff can represent a class "only if" his "claims or defenses . . . are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508.

"The test of typicality is 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998).

The named representatives here cannot meet those standards. The DPPs seek to represent a class that includes three distinct types of purchasers: (1) individuals who bought JUUL online; (2) independent vape shops (which Dr. Léger classifies as "retailers"); and (3) large distributors (including self-distributing retailers) who purchased millions or billions of dollars of JUUL. *See* 4-ER-624.

By the DPPs' own accounting, the second two groups are responsible for 93.4% of the total purchases during the class period through at least March 2024, with the distributors alone responsible for almost 93%. 4-ER-566. The DPPs could not, however, find a single named plaintiff that directly purchased JUUL for resale. Instead, the only named plaintiffs are three individuals who purchased user quantities of JUUL directly from JLI's website for approximately $15 per pack. *See, e.g.*, 6-ER-1210, 1213. Each spent less than $2,000 during the class period. 7-ER-1341.

Individual consumers have little in common with large distributors. Individuals bought small quantities of JUUL online at standard prices set by JLI. 6-ER-1195, 1213; 7-ER-1225-1226, 1357. By contrast, the distributors' purchases were anything but standardized. Each

distributor negotiated individualized purchasing contracts with JLI addressing key terms like price (including discounts), advertising and resale conditions, and rebates. Those negotiations led to different terms for different distributors—indeed, JLI has even been sued by distributors contending they were disadvantaged relative to other distributors. *See Power Buying Dealers USA, Inc. v. Juul Labs, Inc.*, No. 21-CV-03154 (N.D. Ill.), ECF No. 255, Third Am. Compl. And the largest contracts were on the distributors' "paper"—meaning the distributor, and not JLI, drafted key terms, including mechanisms for dispute resolution. *See, e.g.*, 7-ER-1362-1376.

JLI's agreements with distributors are shaped by the shared understanding that distributors resell JUUL. Distributor agreements therefore afford distributors a "margin"—a difference between what the distributor pays JLI and the price at which it is able to resell. 7-ER-1378-1385 (JLI ordering guides showing list price, retail price, and margin); 7-ER-1391-1399. As a result, online purchasers and distributors were subject to materially different pricing policies during the class period. For example, JLI made no change to the online pod prices for individuals until July 2022. 8-ER-1587-1588, 1696-1697. Thus, these individuals paid

the same for pods in 2018—when Altria had its own e-cigarettes—that they did for three and a half years after Altria exited the market. 7-ER-1221-1222.

JLI took a different approach with distributors, instituting changes in the fourth quarter of 2018 to recapture some of the distributors' margins without impacting retail prices. 7-ER-1312, 1447; 8-ER-1612. Specifically, in November 2018, after negotiations with distributors, JLI imposed on the distributors a thirteen-cent list price increase on four-pack pods. 7-ER-1477, 8-ER-1612. In addition, between August 2018 and January 2019—again after discussions with individual distributors—JLI reduced rebates and discounts on a distributor-by-distributor basis. 7-ER-1479-1514; 8-ER-1518-1550.

Such divergence between the characteristics of the named plaintiffs and the class members dooms typicality. *Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006), shows why. In that case, antitrust plaintiffs sought to certify a class of direct purchasers of Microsoft Windows. The representatives were individual consumers who had purchased Windows directly from Microsoft's website, for prices set by Microsoft. The district court excluded from the class, on typicality grounds, "businesses that

purchased large quantities of Microsoft software licenses through Microsoft's Enterprise Program." *Id.* at 465.

The Fourth Circuit affirmed, pointing to "meaningful differences between plaintiffs' claims and those of Enterprise customers." *Id.* at 467. Among other things, business purchasers did not "pay prices established in advance by Microsoft" but instead paid prices that "were negotiated and, as a consequence, were both discounted and unique to each transaction." *Id.* at 468. Thus, "plaintiffs' proof that Microsoft overcharged *them* would hardly prove that Microsoft overcharged the Enterprise customers," who negotiated their deals in a different competitive context." *Id.* (emphasis added). Similarly, in *In re Milk Prods Antitrust Litig.*, 195 F.3d 430 (8th Cir. 1999), the named plaintiff failed to satisfy typicality and adequacy in part because, in a class containing large grocery store chains, she "made only small wholesale purchases at list price." *Id.* at 437.

In *Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317 (9th Cir. 1997), this Court acknowledged these principles in a situation converse to the one here: where large purchasers with significant power to negotiate sought to represent class members without such power. This Court

affirmed the denial of class certification to large named plaintiffs who wielded significant "bargaining power" yet sought to represent a class that included individuals without any ability to bargain. *Id.* at 1321. The Court held that the district court was correct to determine that large companies' bargaining power "would have provided the defendants with a defense to the claim of antitrust injury" not available in individual claims. *Id.*

As these cases each recognize, proving harm to individual consumers differs fundamentally from proving harm to commercial purchasers. That is especially true where, as discussed above, the undisputed record shows that prices for individual purchasers and those for commercial customers did not move in lockstep. *See supra* 52–53. Given those differences, there would be a "substantial gap" in proof between the two groups' respective claims. *Deiter*, 436 F.3d at 468; *cf., e.g.*, *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1251 (10th Cir. 2014) (purchaser plaintiffs established commonality despite individualized pricing negotiations because "the industry's standardized pricing structure" created "an artificially inflated baseline for negotiations such that any impact resulting from a price-fixing conspiracy would have permeated all polyurethane

transactions" (cleaned up)). For example, "even if plaintiffs could show" an overcharge to consumers, that would "not obviate the fundamental question of whether [distributor] plaintiffs negotiated away any overcharge"—which would therefore have to be "addressed at trial" for the distributors, though not for the consumers. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2025 WL 3240044 at *6 (S.D.N.Y. 2025) (*Keurig II*).

Permitting individual consumers to represent commercial entities is additionally problematic because it allows large companies to litigate major individual claims by proxy, without exposing themselves to the burdens and obligations of litigation. That makes a mockery of the class-action's core purpose: "overcome[in]g the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (internal citations omitted); *cf. CSE Safeguard Insurance Co. v. Hyundai Motor America*, 2024 WL 1832423 at *6 (C.D. Cal. 2024) (class action not superior to individual suits where "Plaintiffs are sophisticated litigants with large individual claims and significant resources" who "could efficiently litigate their claims individually").

As Defendants explained in their Rule 23(f) petition, courts in this Circuit have disagreed about whether an individual purchaser can serve as the named plaintiff for a class that includes large commercial distributors. *See* No. 26-1519, Dkt. 1, p. 28–29 (collecting cases). But many courts recognize the problems with permitting such disparate classes. For example, in *In re Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478 (N.D. Cal. 2008), named plaintiffs who "each purchased a single graphics card through [the defendant's] website at retail prices," could not show typicality for a class encompassing wholesale purchasers who "purchased a vast array of products on individually negotiated terms." *Id.* at 489. Likewise, in *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014), "small companies and four individuals" who purchased optical disk drives "at nonnegotiable, list prices through a defendant's distribution subsidiary or retail website" could not establish typicality where the putative class encompassed many other purchasers "whose volumes and means of . . . purchases do not compare" and who "typically negotiated prices." *Id.* at 317; *see also Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 178 (C.D. Cal. 2007) (denying class certification where defendant's "customers had

significantly different purchasing volumes, preferred different . . . products, and operated under materially different contract terms"); *In re Auto. Parts Antitrust Litig.*, 2019 WL 626143, at *3, *11 (E.D. Mich. 2019) (denying certification where "relatively small distributors" purported to represent much larger manufacturers); *Keurig II*, 2025 WL 3240044 at *5 ("exceedingly close call" whether individual consumers were typical and adequate to represent large wholesalers).

The court below summarily declared these authorities inapplicable "given the posture of this case." 1-ER-7. It asserted that conceded differences between the DPPs' representatives and the distributors pose no problem because "there are only two defendants, three channels of distribution . . . and one set of products." *Id.* But that gets the law backwards. Typicality analysis "must involve a comparison of the plaintiffs' claims or defenses with those of the absent class members." *Deiter*, 436 F.3d at 467. However many channels of distribution, what matters is how those channels differ. And the court's other basis for finding typicality—that "*all* channel prices" were allegedly inflated, 1-ER-8 (emphasis in original)—operates at an "unacceptably general" level. *Deiter*, 436 F.3d at 467 (that "all class members . . . were injured" by having paid an "artificially

inflated" price was insufficient to show typicality). It is not enough for class representatives' claims and injuries to resemble those of absent class members—representatives must "'possess the *same* interest and suffer the *same* injury.'" *Amchem*, 521 U.S. at 625–26 (citations omitted) (emphases added).

### B. The Named Plaintiffs Are Not Adequate

For related reasons, the named plaintiffs cannot "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement "tend[s] to merge" with typicality. *Falcon*, 457 U.S. at 157 n.13. Class representation can be "inadequate if the named plaintiff fails to prosecute the action vigorously on behalf of the entire class." *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010).

Here, there is reason to think that the named plaintiffs will not "prosecute the action vigorously on behalf of" distributors. *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023). "Class members with higher-value claims may have interests in protecting those claims from class members with much weaker ones, or from being compromised by a class representative with lesser injuries who may settle more valuable claims cheaply." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs. & Prods.*

*Liab. Litig.*, 895 F.3d 597, 607 (9th Cir. 2018) (cleaned up). Using the most aggressive of Dr. Léger's three overcharge estimates, the named representatives' actual damages range from $27 to $58.[6] These claims look nothing like the distributors' claims. Especially concerning is that, as noted, prices for the different types of direct purchasers did not move in lockstep, suggesting that the named plaintiffs lack "the appropriate incentive to establish antitrust violations with respect to all of the absent class members," *GPU*, 253 F.R.D. at 490, particularly for the portion of the class period where prices for online purchasers held constant. Dr. Léger's analysis illustrates the point: he "only observe[d] estimated overcharges at the consumer level (*i.e.*, the end-user)" and then reverse engineered a hypothetical overcharge for distributors. 4-ER-624.

There are ample additional reasons to doubt the Plaintiffs' adequacy to represent the class. Two of the three testified at their depositions they did not even know that they purportedly represented distributors. When asked, Sieber said that he believed the direct purchaser class includes only individuals and was entirely unaware that it includes

[6] Dr. Léger's highest overcharge estimate is 3%. Devin Black purchased $1928.19 in JUUL, Jake Sieber spent $970.27, and Robert Thompson spent $895.48. 7-ER-1341.

distributors. 6-ER-1199-1201. Black was similarly oblivious. 6-ER-1207 ("Q. So does the class of people who you are representing in this case include people who purchased other ways, not from the website? A. No."). Nor do any of the named plaintiffs understand resellers' and distributors' complex business models and sophisticated dealings with JLI. *See, e.g.*, 6-ER-1196-1197.

This is insufficient. Adequacy "require[s] the class representatives to possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting the litigation." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 482–83 (5th Cir. 2001). "[A]lthough a knowledge or understanding of all the intricacies of the litigation is not required," the court must deny certification if the "a representative lacks sufficient interest, credibility, or either knowledge or an understanding of the case . . . to ensure that the parties are not simply lending their names to a suit controlled entirely by the class attorney." *Monroe v. City of Charlottesville*, 579 F.3d 380, 385 (4th Cir. 2009); *see also, e.g.*, *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 649 (N.D. Cal. 2007) (similar). Put differently, "the named plaintiff must have some commitment to the case, so that the 'representative' in a class action is not a fictive concept." *Rand*

*v. Monsanto Co.*, 926 F.2d 596, 598–99 (7th Cir. 1991), *overruled on other grounds by Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015).

Accordingly, courts "have properly denied class certification where the class representatives had so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 727 (11th Cir. 1987); *Welling v. Alexy*, 155 F.R.D. 654, 659 (N.D. Cal. 1994) (named plaintiff inadequate due to his "apparent unfamiliarity with the allegations in the amended complaint and the overall status of the proceedings"). This risk is especially acute where the plaintiff seems confused about the class he purportedly represents. *See, e.g.*, *Alberghetti v. Corbis Corp.*, 263 F.R.D. 571, 580 (C.D. Cal. 2010) (finding named plaintiffs inadequate where "each propose a much narrower class than their counsel seeks"), *aff'd*, 476 F. App'x 154 (9th Cir. 2012); *Milk Prods.*, 195 F.3d at 437 (plaintiff "cast[] doubt on [her] desire to represent the entire class" in light of testimony that she sought to represent "only small convenience stores, not very large grocery stores and convenience store chains,"

suggesting she would not be "a fair and adequate representative of the class").

The district court's only response was its *ipse dixit* that the named DPPs had the requisite "basic level of knowledge," even as it acknowledged their ignorance of distributors' business models and class membership. 1-ER-8-9. Rule 23 may require only a "minimal degree of knowledge about the litigation," *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 430 (3d Cir. 2016), but that requirement cannot be meaningless, *see id.* (finding "that the class representatives ably discharged their duties by closely following the litigation").

One final typicality and adequacy problem is that virtually all the distributors have unique forum-selection and arbitration clauses in their contracts with JLI. 7-ER-1301-1303. Because no named plaintiffs are subject to such potential defenses, they are ill-equipped to address those defenses on absent class members' behalf. *Cf. Hanon*, 976 F.2d at 508 ("The certification of a class is questionable where it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff or to a subclass."); *see, e.g.*, *Avilez v. Pinkerton Gov't Servs., Inc.*, 596 F. App'x 579 (9th Cir. 2015) ("The district court abused

its discretion to the extent it certified classes and subclasses that include employees who signed class action waivers. . . . To the extent the classes and subclasses include individuals who signed class action waivers, [plaintiff] is not an adequate representative, and her claim lacks typicality." (citation omitted)); *Conde v. Open Door Mktg., LLC*, 223 F. Supp. 3d 949, 960 (N.D. Cal. 2017) (finding lack of typicality because the named plaintiffs "have no interest in the enforceability of the arbitration agreement itself, and lack the ability to challenge the agreements on behalf of individuals who did sign such agreements").

The district court never explained why the named plaintiffs had an adequate interest in litigating defenses inapplicable to them. *See* 1-ER-10-11. In fact, the class representatives have no stake in the court's interpretation of those agreements. This means that "[i]n significant respects, the interests of those within the single class are not aligned." *Amchem*, 521 U.S. at 626. And "[i]t does not suffice that *counsel* have an incentive to prove the wholesalers' claims"; what matters "is whether the clients themselves, who ultimately control and drive the litigation, have the requisite typicality." *GPU*, 253 F.R.D. at 490 (emphasis in original).

### C. The Direct Purchaser Plaintiffs Lack Classwide Proof of Injury

The DPPs also failed to establish predominance under Rule 23(b). Their theory of injury is that the alleged conspiracy caused them to overpay for JUUL. To obtain certification, they needed a model capable of proving classwide injury and damages. *Rail Freight*, 725 F.3d at 253 ("No damages model, no predominance, no class certification."). Dr. Léger's model is their only affirmative evidence of classwide injury. But his analysis is unreliable under *Daubert* and therefore cannot satisfy Plaintiffs' burden. *See Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) ("In evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*.").

"When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable," the opinion must be excluded. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Exclusion is also warranted where an expert "reject[s] or ignor[es] . . . evidence that contradicts his conclusion," *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp.

2d 1166, 1176 (N.D. Cal. 2007), or where the expert's model is fundamentally disconnected from the record evidence, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Ultimately, the court must "make certain that an expert . . . employs in the courtroom the same level of rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Here, Dr. Léger used an "antitrust logit model" (ALM) to estimate overcharge and damages in the past. Dr. Léger's model begins with three market conditions as they existed just before Altria's investment in JLI: (1) the market share of companies in the market at that time, (2) the price of an "average" JLI product, based on retail data, and (3) the cost of producing a "generic" e-cigarette product, based on JLI, Altria, and third-party R.J. Reynolds's variable costs. 4-ER-631-632. Dr. Léger then uses those "fundamentals" to predict how JUUL's price would develop in two future markets—one in which Altria remains in the market and another where it does not. 4-ER-622, 631-632.

For both predictions, Dr. Léger's ALM assumes that market conditions in 2018 continue to hold indefinitely, rather than looking to real-world market data from after the transaction to see if those conditions changed. For example, the ALM assumes that no other product was launched during the class period, ignoring that flavored disposables flooded the market after Altria's investment in JLI. 5-ER-698-699; 7-ER-1320-1322. The ALM assumes further that JLI retained its leading market position in 2018 for the entire damages period, even though JUUL's share eroded after the investment such that both disposables and Vuse Alto surpassed JUUL by 2022. 5-ER-778-780. Dr. Léger ultimately generated overcharge estimates assuming Altria would have achieved a 10%, 20%, or 30% market share had it remained in the market—without opining which of those estimates the evidence supports. 4-ER-623.

Because an ALM like Dr. Léger's operates by comparing two *predictions*, it is used in prospective contexts like proposed mergers. *See* Zetenyi & Beckford, *Logit or Leave It?,* Competition Policy Int'l at 1 n. 21 (Aug. 11, 2024), https://perma.cc/H553-63NX; Werden & Froeb, *The Antitrust Logit Model For Predicting Unilateral Competitive Effects*, 70 Antitrust L.J. 257 (2002) (defending ALM as "a valuable quick look" to

analyze "unilateral competitive effects *from mergers*") (emphasis added); 7-ER-1323-1325. To analyze the competitive impact of a merger before it happens, economists must rely on limited pre-merger information to forecast how prices would develop if the merger happens, and how they would develop if it does not. In such cases, there is no post-transaction data to analyze, which is why the ALM relies exclusively on pre-transaction market data.

It makes no sense, however, to use a model designed for predicting an *unknown future* to "predict" a *known past*. Doing so impermissibly "substitutes mathematical assumptions for actual, readily-obtainable information." *Laumann v. Nat'l Hockey League*, 117 F.Supp.3d 299, 315 (S.D.N.Y. 2015). Neither Plaintiffs nor the district court identified any case approving an ALM like Dr. Léger's for use in retrospective analysis. At best, Dr. Léger cites peer-reviewed articles defending the ALM, but each concerns prospective mergers. 4-ER-620-621, n. 334. There is no support for the proposition that ALMs are accepted in the field as a method for retrospective analysis. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) (*Daubert* requires "objective and verifiable evidence of the validity" of the method).

Dr. Léger testified he had never before used an ALM to determine an overcharge. 7-ER-1352-1353. That is a significant red flag, as this Court explained on remand in *Daubert*: "One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995).

Relying on speculative predictions makes particularly little sense when there is ample real-world data on that precise issue. JLI's pod prices for consumers stayed unchanged from 2018 to 2022, its pod prices for distributors were subject to small modifications, and its device prices went down significantly. *See supra* 52–53. In addition, the market experienced several undisputed shocks, including the FDA's flavor ban and the rise of cheap, flavored disposables. *Supra* 12. Dr. Léger's ALM disregards those facts in favor of a fictional construct in which JLI's leading position never changes and there are no new market entrants. But Plaintiffs cannot "substitute" modeling for "market facts." *Brown & Williamson Tobacco Corp.*, 509 U.S. at 242. Where "indisputable record facts

contradict or otherwise render the [expert's] opinion unreasonable," it should be excluded. *Id.* at 242; *see Hynix Semiconductor Inc. v. Rambus Inc.*, 2008 WL 73681, at *5 (N.D. Cal. Jan. 5, 2008) (under *Daubert*, "[a] reasonable jury cannot credit testimony that fails to reflect reality.").

Under the *Daubert* factors, this use of the ALM falls short. Notably, a district court in this Circuit rejected use of an ALM precisely because it relied on assumptions rather than real market data. *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *6–8 (N.D. Cal. 2023). As that court found, an ALM assumes substitution between products is proportionate to their relative shares. *Id.* at *6. If product *A* has a 50% share, and *B* has 10%, the ALM assumes that competitor *C*'s leaving the market will cause 5 times the substitution to *A* than it does to *B*. *See id.*; 7-ER-1317. The model makes such assumptions because it is designed for situations where no real-world data is available. Thus, in *Google Play Store*, the expert's model was inadmissible because it mistakenly assumed that "all apps in a given app category must be substitutes for each other." 2023 WL 5532128, at *6.

Likewise, here, Dr. Léger's model wrongly assumed that, simply because JLI had the largest market share in 2018, the majority of Altria's

cig-a-like users switched to JUUL and continued to purchase JUUL throughout the entire damages period, well after JUUL's real-world market share plummeted. He made no attempt to confirm that assumption using real-world data, nor could he given the abundant sales data to the contrary. 5-ER-714-715. After the FTC trial on these very issues, the ALJ found that the record did not support the assumption of proportional substitution. 6-ER-1018. At a minimum, Dr. Léger should have provided "usable guidance on what to do with the myriad of differences and distinctions" between Altria's and JLI's products to avoid "the jury simply guessing about proportionate substitution." *Google Play Store*, 2023 WL 5532128, at *7.

Plaintiffs' retort—adopted by the district court—that a model should not be excluded simply because it is "based on economic theory and assumptions," 1-ER-15, is a strawman. Of course, models may need to use appropriate assumptions in predicting outcomes in a but-for world. It does not follow that *Daubert* permits using a model designed to predict the future to generate a fictional past—much less *when full information about what happened is readily available*. Because Dr. Léger's methodology is unreliable, Plaintiffs cannot show common injury. This Court

should reverse certification of the DPP class for this independent reason as well.

## CONCLUSION

The Court should reverse the class certification order.

Respectfully submitted,

*/s/Beth Wilkinson*_______
Beth Wilkinson
James M. Rosenthal
Rakesh Kilaru
Daniel Epps
David Friedman
Jenna P. Swarbrick
Guus Duindam
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor Washington, DC 20036
(202) 847-4000

Jeremy Barber
WILKINSON STEKLOFF LLP
130 W 42nd Street, 24th Floor
New York, NY 10036
(212) 294-8910

Lisa Blatt
Charles L. McCloud
Edward Pickup
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC 20024
(202) 434-5000

*Counsel for Defendants-Appellants Altria Group, Inc., and Altria Enterprises, LLC*

David I. Gelfand
Jeremy J. Calsyn
Nowell D. Bamberger
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037

*Counsel for Defendant-Appellant Juul Labs, Inc.*

Mark C. Hansen
Michael J. Guzman
David L. Schwarz
Andrew Skaras
Stephanie E. Levin
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Counsel for Defendants-Appellants Nicholas Pritzker and Riaz Valani*

## STATEMENT OF RELATED CASES

Defendants state, pursuant to Ninth Circuit Rule 28-2.6, that they are unaware of any cases related to this appeal.

July 21, 2026

*/s/Beth A. Wilkinson*
*Counsel for Defendants-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS system. I also caused a copy of the brief and attached materials to be served via electronic mail to the following recipients:

Joseph R. Saveri
Ronnie Spiegel
David H. Seidel
Diane S. Rice
Itak Moradi
Trevor Young
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, California 94104
(415) 500-6800
jsaveri@saverilawfirm.com
rspiegel@saverilawfirm.com
dseidel@saverilawfirm.com
drice@saverilawfirm.com
imoradi@saverilawfirm.com
tyoung@saverilawfirm.com

Michael M. Buchman
Christopher Hydal
**SAVERI LAW FIRM, LLP**
780 Third Avenue, Suite 1200
New York, NY 10017
Telephone: (347) 790-0069
Facsimile: (347) 790-0029
mbuchman@saverilawfirm.com
chydal@saverilawfirm.com

*Interim Lead Counsel for Direct Purchaser Plaintiffs and the Class*

John D. Radice
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
(646) 245-8502
jradice@radicelawfirm.com

*Counsel for Direct Purchaser Plaintiffs*

Elana Katcher
**KAPLAN FOX & KILSHEIMER LLP**
800 Third Avenue, 38th Floor
New York, NY 10022
(212) 687-1980
ekatcher@kaplanfox.com

Solomon B. Cera
**CERA LLP**
50 California St. Suite 1500
San Francisco, CA 94111
(415) 777-2230
scera@cerallp.com

C. Andrew Dirksen
**CERA LLP**
529 Main Street, Suite P200
Boston, MA 02129
(857) 453-6555
cdirksen@cerallp.com

*Counsel for Indirect Reseller Plaintiffs*

Robin F. Zwerling
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
(212) 223-3900
rzwerling@zsz.com

Thomas H. Burt
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
(212) 545-4600
burt@whafh.com

Betsy C. Manifold
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
(619) 239-4599
manifold@whafh.com

Fred T. Isquith, Sr.
**ISQUITH LAW PLLC**
103 East 84th Street
New York, NY 10028
(718) 775-6478
isquithlaw@gmail.com

Merle C. Meyers
Michele Thompson
**MEYERS LAW GROUP, P.C.**
44 Montgomery St. Suite 1010
San Francisco, CA 94104
(415) 362-7500
mmeyers@meyerslawgroup.com
mthompson@meyerslawgroup.com

*Class Counsel for the Indirect Purchaser Plaintiffs*

David I. Gelfand
Jeremy J. Calsyn
Nowell D. Bamberger
Caleb J. Robertson
**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 974-1752
(202) 974-1599
dgelfand@cgsh.com
jcalsyn@cgsh.com
nbamberger@cgsh.com
cjrobertson@cgsh.com

*Counsel for Defendant Juul Labs, Inc.*

Mark C. Hansen
Michael J. Guzman
David L. Schwarz
Andrew Skaras
Stephanie E. Levin
**KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK,
P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mhansen@kellogghansen.com
mguzman@kellogghansen.com
dschwarz@kellogghansen.com
askaras@kellogghansen.com
slevin@kellogghansen.com

*Counsel for Individual Defendants Pritzker & Valani*

July 21, 2026

*/s/Beth Wilkinson*________
*Counsel for Defendants-Appellants*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-2626

I am the attorney or self-represented party.

**This brief contains** 13,940 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ____________.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Beth Wilkinson **Date** July 21, 2026
*(use "s/[typed name]" to sign electronically-filed documents)*