**No. 26-2626**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

**IN RE JUUL LABS, INC. ANTITRUST LITIGATION**

On Rule 23(f) Interlocutory Appeal from the United States District Court for the Northern District of California, San Francisco Division
No. 3:20-CV-02345-WHO
The Honorable William H. Orrick

## DIRECT PURCHASER PLAINTIFFS' ANSWERING BRIEF

Joseph R. Saveri
Ronnie S. Spiegel*
David H. Seidel
Itak K. Moradi
SAVERI LAW FIRM, LLP
550 California Street, Suite 910
San Francisco, California 94104
Telephone: (415) 500-6800

* *Located in Washington State*

*Counsel for Direct Purchaser Plaintiffs-Appellees*

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. COUNTERSTATEMENT OF THE CASE ..... 3

III. STANDARD OF REVIEW ..... 3

IV. ARGUMENT ..... 3

A. The district court properly certified the DPP class. ..... 3

1. The court did not err in finding Plaintiffs' claims typical of the class. ..... 7

2. The named Plaintiffs are adequate. ..... 15

B. Defendants' challenge of the district court's *Daubert* ruling should be denied. ..... 17

1. Defendants' *Daubert* challenge is not properly before this Court. ..... 18

2. Class certification was appropriate irrespective of Dr. Léger's opinions. ..... 21

3. The district court properly held that Dr. Léger's expert opinions were admissible under *Daubert*. ..... 22

V. CONCLUSION ..... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allegra v. Luxottica Retail N. Am.*,
341 F.R.D. 373 (E.D.N.Y. 2022)....25

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*,
247 F.R.D. 156 (C.D. Cal. 2007)....15

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....5

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
620 F.2d 1360 (9th Cir. 1980)....12

*Bigelow v. RKO Radio Pictures*,
327 U.S. 251 (1946)....23

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975)....15

*BP P.L.C. v. Mayor & City Council of Baltimore*,
593 U.S. 230 (2021)....18, 19, 21

*Brown v. Rawson-Neal Psychiatric Hosp.*,
840 F.3d 1146 (9th Cir. 2016)....22

*CGC Holding Co., LLC v. Broad & Cassel*,
773 F.3d 1076 (10th Cir. 2014)....21

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013)....26, 27

*Cummings v. Connell*,
316 F.3d 886 (9th Cir. 2003)....15

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995)....30

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006)....13

*F.T.C. v. BurnLounge, Inc.*,
753 F.3d 878 (9th Cir. 2014) ....................................................................3, 22

*Hanon v. Dataproducts Corp.*,
976 F.2d 497 (9th Cir. 1992) ......................................................................1, 7

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
392 U.S. 481 (1968)..........................................................................................10

*Ill. Brick Co. v. Ill.*,
431 U.S. 720 (1977)..........................................................................................10

*In re Animation Workers Antitrust Litig.*,
123 F. Supp. 3d 1175 (N.D. Cal. 2015)............................................................12

*In re Auto. Parts Antitrust Litig.*,
2019 WL 626143 (E.D. Mich. Jan. 7, 2019) .....................................................14

*In re Capacitors Antitrust Litig. (No. III)*,
2018 WL 5980139 (N.D. Cal. Nov. 14, 2018) ..................................................16

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2022 WL 4596621 (N.D. Cal. Aug. 1, 2022) ....................................................10

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2013 WL 5429718 (N.D. Cal. June 20, 2013).............................................10, 16

*In re Dial Complete Mktg. & Sales Pracs. Litig.*,
320 F.R.D. 326 (D.N.H. 2017) .........................................................................25

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
2006 WL 1530166 (N.D. Cal. June 5, 2006).............................................2, 8, 13

*In re Google Play Antitrust Litig.*,
(N.D. Cal. Aug. 28, 2023).........................................................................27, 28

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008).....................................................................14

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.,*
2025 WL 71988 (N.D. Cal. Jan. 10, 2025).....................................................8, 9

*In re Lidoderm Antitrust Litig.*,
2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ........................................ 10

*In re Mego Fin. Corp. Sec. Litig.*,
213 F.3d 454 (9th Cir. 2000) ........................................ 15

*In re Optical Disk Drive Antitrust Litig.,*
303 F.R.D. 311 (N.D. Cal. 2014) ........................................ 13, 14

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Cal. 2009) ........................................ 8

*In re Telescopes Antitrust Litig.*,
348 F.R.D. 455 (N.D. Cal. 2025) ........................................ 24

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
267 F.R.D. 291 (N.D. Cal. 2010) ........................................ 8, 9, 14, 16

*In re Turkey Antitrust Litig.*,
2025 WL 264021 (N.D. Ill. Jan. 22, 2025) ........................................ 10

*In re Urethane Antitrust Litig.,*
768 F.3d 1245 (10th Cir. 2014) ........................................ 5, 10

*In re Visa Check/MasterMoney Antitrust Litig.*,
280 F.3d 124 (2d Cir. 2001) ........................................ 21

*Just Film, Inc. v. Buono*,
847 F.3d 1108 (9th Cir. 2017) ........................................ 2, 6, 7

*Leyva v. Medline Indus. Inc.*,
716 F.3d 510 (9th Cir. 2013) ........................................ 3

*Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*,
244 F.3d 1152 (9th Cir. 2001) ........................................ 16

*Moeller v. Taco Bell Corp.*,
220 F.R.D. 604 (N.D. Cal. 2004) ........................................ 16

*Moser v. Benefytt*,
8 F.4th 872 (9th Cir. 2021) ........................................ 18, 19

*Nitsch v. DreamWorks Animation SKG Inc.*,
315 F.R.D. 270 (N.D. Cal. 2016)....................................................................12

*Noohi v. Johnson & Johnson Consumer Inc.*,
146 F.4th 854 (9th Cir. 2025) ..........................................................................23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .........................................................................2, 21

*Orshan v. Apple Inc.*,
2024 WL 4353034 (N.D. Cal. Sept. 30, 2024).................................................12

*Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*,
526 F.2d 1196 (9th Cir. 1975) ...................................................................23, 29

*Palmer v. BRG of Ga., Inc.*,
498 U.S. 46 (1990)..............................................................................................4

*Parsons v. Ryan*,
754 F.3d 657 (9th Cir. 2014) ......................................................................1, 2, 7

*Rothe Dev., Inc. v. Dep't of Def.*,
107 F. Supp. 3d 183 (D.D.C. 2015)..................................................................24

*Rusoff v. Happy Grp., Inc.*,
2026 WL 2387098 (9th Cir. Aug. 17, 2026) ...............................................18, 19

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) ............................................................................15

*Tawfilis v. Allergan, Inc.*,
2017 WL 3084275 (C.D. Cal. June 26, 2017) ..................................................16

*Ticketmaster Corp. v. Tickets.Com, Inc.*,
2003 WL 25781900 (C.D. Cal. Jan 27, 2003) ..................................................24

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016)............................................................................................7

*United States v. Hinkson*,
585 F.3d 1247 (9th Cir. 2009) ............................................................................3

*United States v. Topco Assocs., Inc.*,
405 U.S. 596 (1972)....................................................................................4

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
2015 WL 12806484 (D. Del. Sept. 25, 2015)....................................................25

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)....................................................................................6

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) ....................................................................1, 3

**Statutes**

28 U.S.C. § 1447(d) ....................................................................................18

**Court Rules**

Fed. R. Civ Proc. 23 ....................................................................................*passim*

Fed. R. Civ Proc. 23(a) ..............................................................................1, 6

Fed. R. Civ Proc. 23(a)(2)..............................................................................21

Fed. R. Civ Proc. 23(a)(3)................................................................................7

Fed. R. Civ Proc. 23(a)(4)..............................................................................15

Fed. R. Civ Proc. 23(b)(3) ..........................................................................6, 19

Fed. R. Civ Proc. 23(f)...............................................................................18, 20

Fed. R. Evid. 702 ......................................................................................2, 18

**Other Authorities**

Frank Verboven & Theon van Dijk, *Cartel Damages Claims and the Passing-on Defense*, 57 J. of Indus. Econ. 457 (2009).......................................25

Gregory J. Werden & Luke M. Froeb, *The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy*, 10 J.L. Econ. & Org. 407 (1994)..........................................................24

J. Douglas Zona, *Structural Approaches to Estimating Overcharges in Price-Fixing Cases*, 77 Antitrust L.J. 473 (2011) ....................24

Kenneth Train, LOGIT IN DISCRETE CHOICE METHODS WITH SIMULATION 34 (Cambridge Univ. Press 2009) ....................23

Nathan H. Miller et al., *Using Cost Pass-Through to Calibrate Demand*, 118 ECON. LETTERS 451 (2013) ....................28

1 William B. Rubenstein, NEWBERG ON CLASS ACTIONS § 3:45 (5th ed. 2011) ....................13

## I. INTRODUCTION

The district court properly certified the Direct Purchaser Plaintiffs' ("DPPs") case by faithfully complying with all requirements of Rule 23. Its decision rests on careful analysis of an extensive record developed over seven years of litigation and on well-settled antitrust and class certification jurisprudence of the Supreme Court, this Court, and courts across the country. Defendants identify no error warranting reversal. Instead, they ask this Court to revisit evidence-based determinations concerning typicality, adequacy, and one of Plaintiffs' experts opinions under *Daubert*. Those factual determinations of the district court are entitled to substantial deference. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010).

Defendants first contend the named Plaintiffs are atypical and inadequate because they purchased differently, and in different volumes, than some absent class members. That is not the law of the Ninth Circuit. Rule 23(a)'s typicality requirement turns on whether representatives and absent class members suffered similar injuries arising from the same course of conduct. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). It does not require identical purchases. *Parsons v. Ryan*, 754 F.3d 657, 685–86 (9th Cir. 2014).

Here, Plaintiffs and class members' claims arise from a single conspiracy that impacted all purchasers. They share the same theory of liability, the same

theory of impact and damages, and the same interest in proving Defendants' conduct caused them to pay higher prices. Any differences in the amount or method of purchase do not create antagonistic interests. *Id.*; *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116–17 (9th Cir. 2017); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *5 (N.D. Cal. June 5, 2006) (recognizing "substantial legal authority" finding typicality in conspiracy cases notwithstanding differences among class members in "pricing, products, and/or methods of purchasing products").

Second, Defendants seek to convert a dispute over the persuasiveness of DPPs' common proof of impact into a predominance defect. As required by Rule 23, the district court properly asked whether DPPs' evidence—including several experts' analyses and substantial documentary record—was capable of establishing classwide impact through common proof. Dr. Léger was only one piece of that showing. Consistent with Rule 702, the court evaluated his methodology, Defendants' limited attempts to supply competing evidence, and their quarrel with some of his assumptions, and found Defendants posed factual disagreements that went only to the weight of his testimony. 1-ER-12, 17.

Defendants dispute what the common evidence proves—not whether impact is susceptible to common proof. *See Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–67 (9th Cir. 2022). They now ask this

Court to reweigh competing evidence and substitute its judgment for the district court's—precisely what abuse-of-discretion review does not permit. The appeal should be denied.

## II. COUNTERSTATEMENT OF THE CASE

To avoid duplication of common facts, DPPs incorporate Section III of Indirect Purchasers' Answering brief.

## III. STANDARD OF REVIEW

Class certification rulings are reviewed under the "significantly deferential" abuse-of-discretion standard. *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009). An order granting certification receives "noticeably more deference" than an order denying it. *Wolin*, 617 F.3d at 1171. Factual findings are reviewed for clear error. The Court may reverse a trial court that applied the correct legal standard only if its findings are "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the record." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013) (citation omitted). A district court's decision to admit expert testimony is subject to the same standard. *See F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 882 (9th Cir. 2014).

## IV. ARGUMENT

### A. The district court properly certified the DPP class.

DPPs' claim is straightforward. The class—direct individual, retailer, and distributors that purchased JLI products directly—paid more than they would have

but for the unlawful agreement that Altria exit the market and cede its market share to its main competitor. Agreements between horizontal competitors not to compete violate federal antitrust law. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49–50 (1990).

DPPs' claim relies on classwide proof. Whether Defendants agreed Altria would cease competing with JLI, whether that agreement violated Section 1, whether Altria's exit diminished competition, and whether the resulting reduction in competition elevated prices all turn on Defendants' conduct and classwide evidence—not the circumstances of any particular class member. Defendants have never disputed that common questions exist, 1-ER-6, nor do they contend that impact from the conspiracy is not amenable to classwide proof. DPPs showed that the elements of their Section 1 claim (violation, impact, and damages) as well as their Section 7 claim are established through common evidence, including six expert opinions. *See* 1-DPP-SER-2–37; 2-DPP-SER-341–376.

DPPs offer overwhelming proof of common impact. First, the fact of Altria's exit—and its express agreement not to compete with JLI—is enough on its own to show classwide impact. DPPs' evidence includes thousands of contemporaneous business records, party admissions, and lay witness testimony that show the purpose and effect of Defendants' conduct was to reduce competition—and that competition was in fact eliminated. DPPs' expert Dr. Perry employed qualitative

and quantitative methodologies to demonstrate market-wide harm (4-DPP-SER-648–671), including: (1) a reduction in competition and losses in innovation (*id.* ¶¶133–147); (2) a presumptively high post-exit Herfindahl-Hirschman Index of 5,388 (*id.* ¶¶ 130–132); and (3) that Altria's eventual market re-entry did not restore pre-transaction competitive dynamics (*id.* ¶¶ 147–148). Drs. Hoelle and Léger each concluded that JLI's class-wide prices were higher due to Altria's exit, and that class members paid an overcharge during the class period. Both experts not only demonstrated a workable methodology to calculate class-wide damages but went one step further—unnecessary at certification—and measured them. 4-ER-616–627; 3-DPP-SER-464–493, 419–420.

This is precisely why class treatment is appropriate for antitrust cases. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (identifying "predominance of common issues" as "readily met" in antitrust claims). Conspiracy creates a presumption of classwide impact. Even where class member purchases have some variation, courts recognize that conspiracy is the overriding common issue, and proof thereof focuses on defendants' conduct and impact on class members, rather than any individual plaintiff's positioning. *E.g., In re Urethane Antitrust Litig.,* 768 F.3d 1245, 1254 (10th Cir. 2014) (collecting cases). Representatives need not suffer injuries identical to the class so long as all claims

arise from the same course of conduct and are based on the same theory. *Just Film, Inc.*, 847 F.3d at 1116.

After submission of the extensive certification record, the court spent eight months considering competing evidence and arguments before issuing its thorough opinion. Applying the "rigorous analysis" required, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011), the court found Rule 23(a) satisfied and concluded common questions predominate under Rule 23(b)(3). 1-ER-6–13.

Defendants' appeal identifies no error in that analysis. Their Rule 23(a) arguments do not undermine DPPs' "evidence-based claim" that "all channel prices were inflated by the anticompetitive conduct," or the court's conclusion that the Plaintiffs are adequately incentivized to pursue that claim. 1-ER-7–11. Defendants' Rule 23(b)(3) arguments fare no better. As the district court noted, what Defendants characterize as predominance defects are merits challenges to just one aspect of DPPs' thorough demonstration of common impact—not attacks on whether DPPs offer methodology capable of addressing common impact on a classwide basis. *See* 1-ER-12 (concluding DPPs' modeling may be attacked at trial but otherwise fits the theory of the case, supplies a path to common proof, and rests on logical assumptions); 1-ER-17 (concluding that Defendants' arguments rest on disputed characterizations of the market and evidence and go, at most, to weight). In other words, Defendants dispute what the common evidence proves, not whether

the overwhelmingly common questions found can be answered with common evidence. The district court examined the record, tested Defendants' objections, and determined the central issues of liability and impact are proven by classwide evidence. Rule 23 requires no more. *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–55 (2016).

**1. The court did not err in finding Plaintiffs' claims typical of the class.**

Plaintiffs do not have to show that every class member transacted on identical terms. Rule 23(a)(3) asks whether representative claims are typical of the class. Typicality "refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose," and is satisfied where plaintiffs and absent class members suffer similar injury from the same course of conduct. *Hanon*, 976 F.2d at 508. The requirement is deliberately "permissive": representative claims need to be "reasonably coextensive" with those of absent class members. *Just Film*, 847 F.3d at 1116; *Parsons*, 754 F.3d at 685.

Those principles have particular force in horizontal conspiracy cases. Where the gravamen of every DPP claim is that defendants conspired to suppress competition and inflated prices, differences in the mechanics of individual purchases do not render representatives atypical. *Parsons*, 754 F.3d at 685–86. Consistent with that principle, courts have long held that antitrust representatives may be typical despite differences in "pricing, products, and/or methods of

purchasing products." *DRAM*, 2006 WL 1530166, at *4–5; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603, 609 (N.D. Cal. 2009) ("The typicality requirement does not mandate that products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members."); *In re TFT-LCD (Flat Panel) Antitrust Litig.,* 267 F.R.D. 291, 303–04 (N.D. Cal. 2010) (rejecting argument that "small buyers" could not represent large-volume purchasers with greater bargaining power because all alleged the same conspiracy caused them to pay supracompetitive prices); *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.,* No. 19-MD-02918-MMC*,* 2025 WL 71988, at *4–5 (N.D. Cal. Jan. 10, 2025) ("*HDD*") (same).

The claims are remarkably co-extensive. As recognized below, this case involves one conspiracy, one product, two manufacturer defendants, and three channels of direct purchase. 1-ER-7. Defendants' asserted distinctions do not disturb alignment between the representatives and the class. The cases on which Defendants rely involve absent class members whose claims required materially different proof.

**Differences in purchase volume or bargaining power do not defeat typicality.** Defendants' challenge, Br. at 51–52, is precisely the type of factual variation which routinely exist in horizontal price-fixing cases, and which courts routinely reject as a basis for rejecting typicality. Recent authority is illustrative. In

*HDD*, defendants argued the representatives “[bore] no resemblance” to “big-box retailers and large-volume purchasers” that entered negotiated contracts. *HDD*, 2025 WL 71988, at *4. Relying on decades of authority, the court rejected the distinction in simple terms: small and large purchasers alike alleged that the same conspiracy caused higher prices. *Id.* at *4–5; *see also TFT-LCD*, 267 F.R.D. at 303–04 (finding purchaser of one Dell monitor typical of large volume purchasers such as Apple and HP, and rejecting contention that “small buyers” were atypical of purchasers buying in “large volumes” with “more bargaining power,” as all alleged same injury from same conduct.).

Defendants argue distributors negotiated materially different sales terms. Br. at 51–52. Yet after years of litigation, Defendants have not identified a single term that caused divergent interests. Indeed, Defendants have never argued any class members were uninjured. Instead, they contrive that the “largest contracts [being] on distributors’ paper’” is evidence of some distributors enjoying favorable terms (though they cite to only three contracts out of thousands of distributors for the proposition), while *still* failing to name any term creating advantage. The distributor agreements Defendants submitted, moreover, contain materially similar

terms.[1] More importantly, the existence of individually negotiated contracts is insufficient to deny class treatment. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-05944-JST, 2022 WL 4596621, at *4 (N.D. Cal. Aug. 1, 2022); *In re Turkey Antitrust Litig.*, No. 19-8318, 2025 WL 264021, at *14 (N.D. Ill. Jan. 22, 2025); *Urethane*, 768 F.3d at 1254. For the same reasons, variances in discounts or rebates do not defeat typicality. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2013 WL 5429718, at *10 ("*CRT I*").

The fact that direct purchasers sell purchases at a markup is of no moment. Br. at 52. Under federal antitrust law, damages claims are limited to direct purchases and a pass-on defense is foreclosed.[2] A defendant cannot defeat or diminish a direct purchaser's injury or incentive to litigate on behalf of others by arguing that other class members resold the product or passed part of the overcharge when selling downstream at a markup. *See, e.g.*, *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *26 (N.D. Cal. Feb. 21, 2017) (certifying class with consumers at different levels of distribution chain).

---

[1] While Defendants repeatedly call the distributor contracts "individualized," they are virtually identical; Defendants conceded in recent briefing there are only ten contract iterations.

[2] *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 489–94 (1968); *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 729–36 (1977).

**Prices need not move in lockstep.** Defendants' contention that there were periods when prices changed for distributors and not for online consumers confuses typical claims, which Rule 23 requires, with identical purchases, which it does not. Br. at 53. JLI's sequencing of its price hikes makes no difference. Moreover, Plaintiffs demonstrated below that when JLI increased prices, even at different times, it did so nearly identically, across all three channels, with little variation. 1-DPP-SER-95–97; 1-DPP-SER–57, ¶ 111; 4-ER-616–619. Regardless, DPPs' injury is not that every purchaser experienced increased prices at identical times, but that, absent Defendants' agreement, competitive prices would have been lower across all channels.

**Arbitration and forum-selection provisions applicable to some class members do not create unique defenses.** As a threshold matter, Defendants mischaracterize the record. It is incorrect that "virtually all the distributors have unique" agreements with JLI. Br. at 63. JLI identified less than 200 distributors with arbitration agreements and only 75 distributors with agreements on forum, out of over 4,000. The record further shows the arbitration agreements are generally uniform and most forum selection provisions are identical. *See supra*, note 1. The presence of these agreements does not create individualized issues that cannot be handled on a class-wide basis. Nor is it true that "no named plaintiffs are subject to

these defenses" such that they are ill-equipped to address these defenses. Br. at 63. Two out of the three representatives are subject to arbitration. 2-DPP-SER-402.

Regardless, the district court correctly held Plaintiffs can proceed as adequate, typical representatives notwithstanding those agreements. Because only JLI has such contracts, the class is entirely aligned with respect to Altria, and each Defendant is jointly and severally liable for the entirety of any judgment. *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1207 (N.D. Cal. 2015); *Nitsch v. DreamWorks Animation SKG Inc.*, 315 F.R.D. 270, 314 (N.D. Cal. 2016) (employees of companies involved in no-poach agreements could recover from any conspirator, including those without arbitration rights); *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1366–67 (9th Cir. 1980) (same). JLI's quite recently sought to enforce these provisions, which DPPs challenge on numerous grounds. Even before DPPs did so, the Court found that DPPs had both the ability and incentive to challenge such defenses, particularly given joint and several liability and the court's ability to narrow the class if necessary. 1-ER-10–11.

More generally, the presence of arbitration agreements does not defeat typicality. The district court's reasoning comports with Rule 23 law where some claims are arbitrable. *Nitsch*, 315 F.R.D. at 314; *Orshan v. Apple Inc.*, No. 5:14-cv-05659-EJD, 2024 WL 4353034, at *8 (N.D. Cal. Sept. 30, 2024) (unique defenses only pose obstacle to certification where they threaten to become focus of

litigation); *1 William B. Rubenstein,* NEWBERG ON CLASS ACTIONS § 3:45 (5th ed. 2011) ("[T]ypicality will generally not be defeated by allegations that the proposed class representative has released the defendants from the claims asserted[.]").

**The differences to which Defendants point do not require "fundamentally" different forms of proof**. Br. at 55. Far from it. Nor did the district court ignore them. It determined, based on long-standing authority, that differences in prices resulting from negotiations, distributor deals, or volume, were of limited relevance given the singular conspiracy alleged, and that they largely drove matters reserved for expert proof and the jury—not a finding of atypicality. 1-ER-6–8.

Defendants' cited cases do not lead to a different result. (Notably, Defendants abandon argument from their petition of a Circuit split.) Each case involved materially different circumstances in which purchaser differences resulted in different antitrust claims or different proof required. *Deiter v. Microsoft Corp.*, 436 F.3d 461 (4th Cir. 2006), was a Section 2 monopolization case in which monopoly power differed by market and sub-markets. Proof there required proof of monopoly power particular to each distribution channel. *See DRAM*, at *4–5 (distinguishing *Deiter* on this basis).

*In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 314–17 (N.D. Cal. 2014), likewise was a Section 1 claim involving different forms of price-fixing.

Some consumer-plaintiffs alleged anticompetitive bid-rigging and others did not. Fatally, plaintiffs did not "proffer[] evidence or allegations [of] . . . express agreements to fix prices across the board." *Id.* at 315. The district court properly distinguished that case because DPPs allege a single agreement inflating prices across all channels. 1-ER-6–7.

Similar differences in claims were present in *In re Auto. Parts Antitrust Litig.*, No. 12-00501, 2019 WL 626143 (E.D. Mich. Jan. 7, 2019). Named representatives and absent class members were harmed by different types of anticompetitive conduct. For example, some were targets of bid-rigging while others were not. The plaintiffs failed to establish that common evidence would prove violation and injury for both groups. *Id.* at *3, *11.

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489 (N.D. Cal. 2008) ("*GPU*"), involved still greater heterogeneity. The named plaintiffs purchased graphics cards, while other class members were wholesalers who purchased bespoke products manufactured to custom specifications. Here, there is just one product. Further, the expert in *GPU* failed to show classwide impact. Their modeling excluded various consumers and used different regressions for each product. *Id*. at 496; *see TFT-LCD*, 267 F.R.D. at 313 (distinguishing *GPU* and finding common impact where expert sufficiently accounted for product and customer variations). *Allied Orthopedics* is farther afield still. The court

determined that different contractual provisions varied purchasers' exposures to the challenged conduct to a degree that some members received economic benefit. *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156 (C.D. Cal. 2007). The district court properly found different facts here.

**2. The named Plaintiffs are adequate.**

Rule 23(a)(4) asks whether "representative parties will fairly and adequately protect the interests of the class." The inquiry focuses on whether plaintiffs and their counsel have conflicts of interest with absent members and whether they will prosecute the action vigorously on behalf of the class. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000); *Staton v. Boeing Co.*, 327 F.3d 938, 957–58 (9th Cir. 2003). Adequacy thus protects against conflicts fundamental to the litigation that would risk overriding common interests. *Blackie v. Barrack*, 524 F.2d 891, 909–10 (9th Cir. 1975). Speculative conflicts are insufficient. *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003).

Defendants identify no such conflicts. First, they recycle their typicality arguments about purchasing methods, arguing Plaintiffs lack incentive to litigate on behalf of larger distributors. Br. at 59–60. But all class members seek the same result of proving that Defendants' agreement to eliminate a competitor caused supracompetitive pricing. The district court properly recognized the differences Defendants raise create no divergent interest in proving that liability or impact. 1-

ER-7–8; *see, e.g., Tawfilis v. Allergan, Inc.,* No. 8:15-cv-00307-JLS-JCG, 2017 WL 3084275, at *9 (C.D. Cal. June 26, 2017) (rejecting adequacy argument based on low-volume and high-volume purchasers).

Second, Defendants attack Plaintiffs by highlighting deposition fragments concerning which entities qualify as direct purchasers and the "complex business models and sophisticated dealings" of distributors. Br. at 60–61. As the lower court recognized, Plaintiffs need only a basic understanding of the nature of the claims and their responsibilities. 1-ER-8–9; *Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001) ("Rule [23(a)(4)] does not require more.").

Courts in this Circuit recognize that "[t]he threshold of knowledge required… is low" and a named representative will ordinarily be inadequate only if "startlingly unfamiliar" with the litigation. *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004). As such, particularly in complex cases, such challenges are widely disfavored. *In re Capacitors Antitrust Litig. (No. III)*, No. 17-md-02801-JD, 2018 WL 5980139, at *10 (N.D. Cal. Nov. 14, 2018); *see CRT I*, 2013 WL 5429718, at *6 (finding "snippets of [mistaken] deposition testimony" about purchases and defendants unpersuasive challenge to adequacy); *TFT-LCD,* 267 F.R.D. at 595 (plaintiffs were adequate despite inability to define aspects of claims).

Plaintiffs readily satisfy the adequacy standard. Each demonstrated more than ample knowledge of their claims and responsibilities. Plaintiff Black testified that direct purchasers are persons or entities that purchase directly from JLI and described the allegations against Defendants. 1-DPP-SER-212–214 at 15:2–13, 18:15–19:2. Sieber likewise described the alleged conspiracy, identified who qualifies as a direct purchaser, and explained the commonality between online purchasers and distributors. 1-DPP-SER-203–208 at 29:16–30:12, 121:7–123:9, 128:2–13. Thompson similarly explained the allegations, the products at issue, and the direct-purchaser class. 1-DPP-SER-218–222 at 25:3–26:6, 31:3–32:5, 129:2–9. Each submitted declarations describing their discovery obligations, understandings of their responsibilities, and dedication to participation in this litigation. 1-DPP-SER-60–71; 2-DPP-SER-377–388. Plaintiffs understand their claims, have no conflicts, and have attested to their desire to vigorously represent the class. They have done so for years.

### B. Defendants' challenge of the district court's *Daubert* ruling should be denied.

Defendants also appeal the district court's denial of their motion to exclude Dr. Léger's opinions under *Daubert*. Br. at 65. The district court properly applied the standard, relying on ample evidentiary and scientific bases to support admissibility. Its ruling should be affirmed.

#### 1. Defendants' *Daubert* challenge is not properly before this Court.

Rule 23(f) provides for interlocutory review of class certification orders. Fed. R. Civ. P. 23(f). A motion to strike under Federal Rules of Evidence 702 has no similar provision permitting interlocutory appeal. While the Court "may address any issue fairly included within the certified order," it "may not reach beyond the certified order to address other orders made in the case." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 241 (2021) (interpreting analogous language under 28 U.S.C. § 1447(d)). Here, the district court's *Daubert* ruling is a separate order not separately appealable.[3]

In *Rusoff v. Happy Group*, this Court cited to *Moser v. Benefytt* for the proposition that the Court had "jurisdiction to review [a] *Daubert* ruling . . . because it 'formed part of the class certification decision and affected whether [the classes] could be certified.'" *Rusoff v. Happy Grp., Inc.,* No. 24-7706, 2026 WL 2387098, at *5 (9th Cir. Aug. 17, 2026) (quoting *Moser v. Benefytt*, 8 F.4th 872, 876 (9th Cir. 2021). But *Russoff* is inapplicable here. First, *Moser* did not hold that an appellate court may review separate *orders*; it merely held that it could review all the *issues*—like personal jurisdiction—properly raised by the parties on class

[3] That the court combined the separate orders into a single document for efficiency purposes is irrelevant. Its order granting certification under Federal Rule of Civil Procedure 23 is a different order under Federal Rule of Evidence 702.

certification. *See Moser v. Benefytt*, 8 F.4th 872, 874–77 (9th Cir. 2021) ("Quite plainly, . . . we are not being asked to review anything 'pendent' to the class certification decision, but simply the class certification decision itself.").

Second, *Russoff* concerned a trial court's order that *excluded* Plaintiffs' only expert on common impact yet still *certified* the class. Appellants in *Russoff* argued—and the Court agreed—that without the expert's opinion, the certification order had to be reversed. It was the *appellees* that sought review of the separate *Daubert* order. The Court reiterated its deference by reviewing the *Daubert* decision to ensure reversal on that ground was proper.

Here, by contrast, the Court can affirm the lower court's ruling *without* reviewing the trial court's separate *Daubert* orders. Moreover, although the court in *Russoff* revisited the lower court's *Daubert* findings for abuse of discretion, it "decline[d] to disturb" those findings given "the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case[.]'" *Rusoff*, 2026 WL 2387098, at *7 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

Defendants seek improper review of an order "beyond the certified order," *BP*, 593 U.S. at 241, by suggesting that Rule 23(b)(3) would have been unmet if Dr. Léger was excluded. Defendants do not argue that Dr. Léger's opinions do not

satisfy common impact assuming his opinions were correctly admitted—nor could they. Rather, they argue only that the district court abused its discretion in denying their separately filed motion to exclude under *Daubert. See* Defs' Br. at 65 ("[Dr. Léger's] analysis is unreliable under *Daubert.*"). And Defendants' petition for review only sought review on the typicality and adequacy issues. It did not raise the separate *Daubert* order at all. No. 25-1519, Dkt. 1.1

Allowing Defendants to appeal the *Daubert* order would open the door to a daisy-chain of additional interlocutory review. For example, Defendants cite to conclusions of their own expert—Dr. Kevin Murphy—to support their argument that Dr. Léger should have been excluded. Br. at 71. But Plaintiffs moved to exclude Dr. Murphy's unreliable opinions. 1-DPP-SER-224–255. To the extent the Court reviews the court's *Daubert* order as to Dr. Léger, it would also need to review the *Daubert* order as to Dr. Murphy, as Defendants use Dr. Murphy's erroneous opinions in support of this appeal. Moreover, it would be inequitable to allow Defendants to appeal their chosen *Daubert* orders now, yet force Plaintiffs to wait until final judgment to review the *Daubert* orders that admitted Defendants' experts. That was not the purpose of Rule 23(f). Similarly, to the extent discovery orders affected Dr. Murphy or Dr. Léger opinions, those orders would also need to be subject to review. That is why Rule 23(f) appeals—by their statutory text—are limited to appeals only of the Rule 23 class certification "order," and not other

orders, like *Daubert* orders, even though related to the certification order. *See BP*, 593 U.S. at 241. Otherwise, Rule 23 would improperly allow parties to essentially "shoehorn every decision that went against it into its petition for interlocutory review." *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1098 (10th Cir. 2014); *see also In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132 n.4 (2d Cir. 2001).

**2. Class certification was appropriate irrespective of Dr. Léger's opinions.**

Defendants argue that Dr. Léger should have been excluded and assume his exclusion would doom certification. To do so, they ignore the voluminous evidence in this case supporting common impact irrespective of Dr. Léger's ALM opinions.

Defendants' assumption that the exclusion of Dr. Léger precludes certification conflates common impact with damages calculations, erroneously heightening the burden at certification. A method of establishing common impact with common evidence is not the same as calculating damages to the class. *See Olean*, 31 F.4th at 666. Once commonality under Rule 23(a)(2) is established, predominance requires only that those common questions predominate over individualized issues, and that plaintiffs' evidence is capable of resolving those common questions "in one [classwide] stroke." *Olean*, 31 F.4th at 666 (quoting Wal-Mart, 564 U.S. at 350).

The district court followed this analysis precisely. It noted Defendants conceded DPPs' persuasive showing of commonality, 1-ER-6, and it determined that DPPs offered voluminous common evidence in business records, layperson testimony, and three experts to demonstrate the common impact stemming from defendants' conspiracy. 1-ER-12–13. Dr. Léger's damages calculations were thus sufficient on their own to establish common impact, but they were not necessary.

As noted, Dr. Perry and Dr. Hoelle also demonstrate common impact, as does voluminous documentary evidence. *See* 1-DPP-SER-24–27; 4-DPP-SER-648–671; 3-DPP-SER-467–515 (¶¶ 124, 153, 157, 159, 182, 189, 190, 225, 236, 239, 240). Defendants make no argument that the non-Léger evidence was insufficient to show common impact, and thus forfeit that argument. *Brown v. Rawson-Neal Psychiatric Hosp.*, 840 F.3d 1146, 1148 (9th Cir. 2016).

### 3. The district court properly held that Dr. Léger's expert opinions were admissible under *Daubert*.

Regardless, the district court did not abuse its discretion in denying Defendants' motion to strike Dr. Léger's testimony. *Daubert* decisions are reviewed for abuse-of-discretion. *BurnLounge*, 753 F.3d at 883. "A district court applying the correct legal standard abuses its discretion only if 'it (1) relies on an improper factor, (2) omits a substantial factor, or (3) commits a clear error of judgment in weighing the correct mix of factors.'" *Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 863 (9th Cir. 2025) (quoting *Sali v. Corona Reg'l*

*Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018)).[4] Defendants point to no such abuses.

Instead, Defendants seek to raise Plaintiffs' burden. Antitrust plaintiffs are entitled to rely on reasonable estimates of damages, precisely because the nature of Defendants' wrongful conduct obscures or prevents documentary proof of damages. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946); *Pac. Coast Agr. Exp. Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196, 1207 (9th Cir. 1975). Defendants ignore decades of antitrust jurisprudence in their attacks.

**a. Logit models generally, and antitrust logit models specifically, are well-established statistical methodologies for evaluating the price effects of reduced competition.**

Logit models and the Antitrust Logit Model ("ALM") are well-established. The logit is the "most widely used discrete choice model." Kenneth Train, LOGIT IN DISCRETE CHOICE METHODS WITH SIMULATION 34–75, at 34 (Cambridge Univ. Press 2009). Daniel McFadden, the economist who published the foundational paper on logit models in 1972, was awarded the Nobel Prize in Economics for his work. 1-DPP-SER-41, ¶¶ 4–5. Courts routinely admit testimony based on logit models. *E.g.*, *Rothe Dev., Inc. v. Dep't of Def.*, 107 F. Supp. 3d 183, 197–98 (D.D.C. 2015).

[4] Defendants do not dispute the first part of the test, which is whether the district court applied the correct legal standard.

The ALM was introduced in a widely cited 1994 academic paper.[5] ALMs and related logit models are used not only in the prospective merger context but also to determine antitrust impact and damages. *See, e.g.*, *In re Telescopes Antitrust Litig.*, 348 F.R.D. 455, 470–71 (N.D. Cal. 2025); *Ticketmaster Corp. v. Tickets.Com, Inc.*, No. CV 99-7654 HLH, 2003 WL 25781900, at *3 (C.D. Cal. Jan 27, 2003). These models seek to answer a common question in antitrust economics: how are prices affected when a competing firm is removed from the market? *See* 1-DPP-SER-42, ¶¶ 6–15; 1-DPP-SER-45-47, ¶¶ 24–34.

Defendants' assertion that there is "no support for the proposition that ALMs are accepted in the field as a method for retrospective analysis" is false. Br. at 68. The use of ALMs to estimate damages is widely accepted precisely because of their ability to home in on the price effects caused by reductions in competition. 1-DPP-SER-49, ¶¶ 55–58. The economic literature supports its use here. *See*, *e.g.*, J. Douglas Zona, *Structural Approaches to Estimating Overcharges in Price-Fixing Cases*, 77 Antitrust L.J. 473–494, 482 n.39 (2011) (explaining that the ALM can be used to model demand and compute an overcharge in support of an estimate of retrospective price-fixing damages); Frank Verboven & Theon van Dijk, *Cartel*

---

[5] Gregory J. Werden & Luke M. Froeb, *The Effects of Mergers in Differentiated Products Industries: Logit Demand and Merger Policy*, 10 J.L. Econ. & Org. 407 (1994).

*Damages Claims and the Passing-on Defense*, 57 J. of Indus. Econ. 457–491, 459 (2009) (merger simulation analysis can be used to "assess the effects of large overcharges" in the context of calculating cartel damages). Numerous courts have approved economists' use of various logit models to establish price impact in antitrust and unfair trade practices cases. *See, e.g.*, *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. CV 11-515-LPS-CJB, 2015 WL 12806484, at *8 (D. Del. Sept. 25, 2015); *Allegra v. Luxottica Retail N. Am.*, 341 F.R.D. 373, 451–453, 456–457 (E.D.N.Y. 2022); *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 330–31, 333 (D.N.H. 2017). Defendants' invitation to categorically ban ALMs from retrospective damage analysis should be rejected.

**b. Defendants misrepresent Léger's methodology.**

Defendants' particular criticisms are that the ALM ignores post-conspiracy data, and that Dr. Léger's analysis is contradicted by real world data. Not so. Dr. Léger relied on actual, real-world market data both before and after Altria's exit in 2018. 1-DPP-SER-49, ¶¶ 55–64. Contrary to Defendants' claim, Dr. Léger's damages model does not assume that market conditions in 2018 "continue to hold indefinitely." Br. at 67. Rather, it took into account market condition changes. 1-DPP-SER-45, ¶¶ 21–23; 1-DPP-SER-49, ¶¶ 55–64. Thus, as JLI's market share began declining, Dr. Léger's damages calculations correspondingly decline. 4-ER-635. It is a grave mischaracterization to claim that Dr. Léger's damages

calculations ignored or are contradicted by real world prices, sales volumes, and other changes in market conditions. 4-ER-631–633; 1-DPP-SER-73–76 at 215:6–7, 216:24–217:4, 222:9–15; 1-DPP-SER-49, ¶¶ 55–64.

Further, contrary to Defendants' claim, the estimated percentage overcharge is not "readily obtainable information" from a "known past." Br. at 68. There is no data showing what would have happened had Altria continued to compete against JLI. Because that did not happen, it must be predicted and modeled.

Indeed, Dr. Léger chose to use the ALM model because it is well-suited to this case. 1-DPP-SER-48, ¶¶ 44–49; *see Comcast Corp. v. Behrend,* 569 U.S. 27, 35 (2013). The model is designed to identify the price impact only of Altria's exit. 4-ER-619–620. It is necessary to separate the effects of Altria's exit from other potentially confounding factors. Otherwise, a model could misattribute price impacts to Altria's exit. Dr. Léger's analysis and choice of model takes this into account. 4-ER-620. *See Comcast*, 569 U.S. at 35. The ALM isolates the price impact of Altria's exit by predicting prices in two scenarios that would be identical but for Altria's exit from the market. *Id.*; *see also* 1-DPP-SER-49, ¶¶ 55–58. That is a key virtue. Because everything that could affect product prices is held constant across these two scenarios, except for Altria's exit from the market, the price impact modeled can be reliably attributed to Altria's exit. *Id.* Then, that Altria-specific price impact is applied to the real-world post-conspiracy price data to

ensure that the damages calculations are entirely reflective of the real-world market changes post 2018. 1-DPP-SER-49, ¶ 62. Thus, to the extent that market conditions changed during the relevant time period, Dr. Léger's ALM accounts for those events. 1-DPP-SER-73–76.

The district court did not abuse its discretion. It correctly applied the standard. The inputs Dr. Léger used are those identified in economic literature: they include pre-exit participant market share, pricing, profit margin, and consumer sensitivity to price changes of e-cigarette products. 4-ER-620–621; 1-DPP-SER-49, ¶¶ 59–62.

Defendants further miss the mark in comparing this case to the expert work in *In re Google Play Antitrust Litig.*, No. 21-md-02981-JD (N.D. Cal. Aug. 28, 2023). Br. at 70–71. In *Google Play*, the product market was cell-phone applications ("apps"). *Google Play*, 2023 WL 5532128, at *1. The *Google Play* court did not hold that ALMs are unreliable. The court merely held that the ALM's proportional diversion assumption was erroneously applied to Google's self-selected app categories—*i.e.*, broad topical groupings such as "education," "game," or "sports." *Id.* at *3, 5. For example, Google's "education" category included Rosetta Stone and Duolingo (apps that teach users a second language) as well as PictureThis—Plant Identifier (an app that identifies plants). The expert assumed that a price hike in Rosetta Stone would result in consumers switching to

PictureThis solely because they were in the same "education" category. *Id.* at *7–9. But language apps and plant identifiers are clearly not substitutes, and the expert did not perform an adequate substitutability analysis. Thus, the Court found the substitution assumption unreliable as applied in that case. *Id.*

The record here is materially different. Dr. Perry analyzed the relevant market for e-cigarettes, and conducted a thorough substitution analysis between cylindrical e-cigarettes ("cig-a-likes") and rectangular e-cigarettes ("pod" vapes). 4-DPP-SER-624–648; 2-DPP-SER-274–287; *see also* 1-DPP-SER-52, ¶ 84. He did not rely on any pre-determined corporate categories. His analysis was based on voluminous real-world data and evidence. 4-DPP-SER-643–648. Defendants' own expert, Dr. Murphy, conceded that this analysis was reliable. *See* 1-DPP-SER-258 at 291:10–17. Defendants do not challenge Dr. Perry's substitution analysis on appeal. Nor could they: minor, immaterial differences between products do not affect reasonable substitutability. Nathan H. Miller et al., *Using Cost Pass-Through to Calibrate Demand*, 118 ECON. LETTERS 451, 452 (2013) (logit modeling is "commonly employed in antitrust analysis of mergers involving differentiated products").

Defendants also assert that in the FTC case, the "ALJ found that the record did not support the assumption of proportional substitution." *See* Br. at 71. But Defendants cite the ALJ's initial opinion, (6-ER-1018), which was subsequently

overruled on that very ground. *See* 2-ER-66–67. Moreover, Dr. Perry's substitutability analysis is different than the FTC's, and Defendants' do not challenge Dr. Perry's substitutability analysis, on which Dr. Léger relies. *See* 1-DPP-SER-52, ¶¶ 84; *see also* ¶¶ 81–87. The fact that the FTC also used an ALM to analyze retrospective harm further supports its application here.

Defendants' argument that other methodologies should have been employed suggests that Dr. Léger inflated the damages estimate through his modeling. But the opposite is true. Other experts employed non-ALM methodologies in this case. Dr. Léger's estimates were the most conservative. For example, one of the indirect purchasers' economist used a before-and-after regression analysis and found an overcharge of 4.6% from 2018 to 2022, and 13% from 2022 to 2024. 5-IP-SER-955. Another found overcharges of 3.56% and 11.96%. 4-IP-SER-826. And DPPs' rebuttal expert, Dr. Hoelle, found an overcharge of 8.6%. 3-DPP-SER-574. Dr. Léger's ALM conservatively estimated the overcharge between 1% and 3.2%. *See* 4-ER-666. Contrary to Defendants' argument, Léger's methodology is precise and conservative. It meets the "reasonable estimate" standard. *Pac. Coast Agr. Exp. Ass'n*, 526 F.2d at 1207.

**c. Dr. Léger is well qualified to apply the ALM.**

Defendants claim it is a "red flag" that Dr. Léger had not previously applied an ALM in antitrust litigation. Br. at 69. But *Daubert* does not limit expert

testimony to repeat courtroom witnesses. Dr. Léger's use of the ALM "grow[s] naturally and directly" out of his extensive experience with logit modeling. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995); 1-DPP-SER-75 at 218:8–10. He regularly teaches courses centered on empirical research methods which include logit modeling and other types of discrete choice modeling. 1-DPP-SER-42, ¶ 10; 1-DPP-SER-75 at 218:16–18; 2-DPP-SER-394–396 (listing publications). Dr. Léger is an academic, not a hired-gun litigation consultant. He has never testified in litigation. The jury is well positioned to determine if this supports or diminishes his credibility.

## V. CONCLUSION

For all these reasons, the court's certification order should not be reversed.

Dated: September 21, 2026 SAVERI LAW FIRM, LLP

By: *[/s/ Joseph R. Saveri]*

Joseph R. Saveri
Ronnie S. Spiegel*
Diane S. Rice
David H. Seidel
Itak K. Moradi
Trevor Young**
**SAVERI LAW FIRM, LLP**
550 California Street, Suite 910
San Francisco, California 94104
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
rspiegel@saverilawfirm.com
drice@saverilawfirm.com
dseidel@saverilawfirm.com
imoradi@saverilawfirm.com
tyoung@saverilawfirm.com

** Located in Washington State*
*** Located in Texas State*

Michael M. Buchman
Christopher J. Hydal
**SAVERI LAW FIRM, LLP**
780 Third Avenue, Suite 1200
New York, NY 10017
Telephone: (347) 790-0069
Facsimile: (347) 790-0029
Email: mbuchman@saverilawfirm.com
chydal@saverilawfirm.com

John D. Radice
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Telephone: (646) 245-8502
Facsimile: (609) 385-0745
Email: jradice@radicelawfirm.com

*Counsel for Direct Purchaser Plaintiffs-Appellees*

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-2626

I am the attorney or self-represented party.

**This brief contains** 6,664 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ○ complies with the word limit of Cir. R. 32-1.
- ○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- ○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- ○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- ○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.
- ○ complies with the length limit designated by court order dated ______.
- ◉ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ Joseph R. Saveri **Date** 9/21/2026
*(use "s/[typed name]" to sign electronically-filed documents)*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 21, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all particpants in the case are registered CM/ECF users and that service wil be acomplished by the appellate CM/ECF system.

Dated: September 21, 2026 By: *___/s/ Joseph R. Saveri___________*
Joseph R. Saveri
SAVERI LAW FIRM, LLP